NORMAN ET AL. *v.* CENTURY ATHLETIC CLUB, INC.

[No. 18, October Term, 1949.]

*Decided November 11, 1949.*

· The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Leonard Weinberg* and *Charles Mindel,* with whom were *George L. Clarke* and *Weinberg & Green* on the brief, for the appellants.

*Lucy Ann Garvey,* with whom was *Avrum K. Rifman* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from an order overruling a demurrer to a bill for (*a*) declaration that plaintiff, lessee under a lease, has the right "to broadcast its boxing bouts by television" and (*b*) an injunction against defendants, successors in interest to the original lessor, from barring plaintiff from "broadcasting by television its boxing bouts."

The lease in question, dated October —, 1943, between Coliseum Club, Inc., lessor, and plaintiff, lessee, recites that lessor owns and operates a large building known as the Coliseum, "for use as a sports center", and plaintiff "promotes and stages boxing bouts" on Monday nights in Baltimore, under sanction of the State. Athletic Com-

mission. By the lease lessor lets to plaintiff and plaintiff leases and takes from lessor all the premises known as the Coliseum Arena, "together with the equipment in the Arena necessary to conduct professional boxing bouts, such as bleacher seats, chairs and boxing ring, for the exclusive use and possession" by plaintiff, of the Arena on Monday night of each week, from 7 p. m. to 1 a. m., for a term of five years to begin April 7, 1946 and to end April 7, 1951, "at the following rental" which plaintiff covenants to pay: Five per cent of "the gross receipts accruing from all professional boxing bouts, contests and exhibitions", less all taxes, present or future, "immediately after the computation of the amounts" each Monday night, with the privilege to plaintiff "to use the box office" in the afternoon from "noon and upwards" when called for by plaintiff. Lessor will not lease the Arena to anyone else "to stage and promote professional boxing bouts" at any time during the term of the lease. If "the percentage of the rent receipts" shall amount to less than $75 for any Monday night, plaintiff will pay lessor the difference. Should plaintiff "call off any scheduled boxing bout" before the day of the bout, no charge will be made by lessor to plaintiff; should plaintiff call it off on "the day of the fight" up until 6 p. m., plaintiff will pay lessor $50, if after 6 p. m. $75. Plaintiff will not during the term of the lease stage or promote any professional boxing contest in Baltimore elsewhere than at the Coliseum, except one such contest during any fiscal year, for which plaintiff will pay lessor $2\frac{1}{2}$ per cent of its gross receipts, less taxes.

Lessor will keep the cooling system in operation and furnish heat, will furnish chairs and bleacher seats, and "the present regulation size boxing ring" with lights in the entire building and over the ring, "will keep the inside of the Coliseum Arena clear of all debris and fit for the purpose intended", chairs are to be placed by lessor in their proper location, to be "fit for the use intended" and to be "dusted and made reasonably fit for

use" by lessor before 8 p. m., the opening for the seating of patrons. Lessor is to furnish hot water for showers and to keep all the plumbing and toilets in condition for use by patrons.

Paragraph 6 provides: "The Landlord agrees to allow the Tenant or its agent, the privilege of broadcasting the boxing bouts and also allows the tenant, or its agent, to install Western Union wires direct to the ring. The Landlord agrees to furnish a reasonably adequate loudspeaker for the purpose of announcing the various fights during the course of the evening".

Should plaintiff fail for four consecutive Monday nights to stage a contest, lessor has an option to cancel the lease. Plaintiff, unless. otherwise ordered by the State Athletic Commission, will have, at each show, at least one ten-minute intermission "just prior to the main bout". "* * * all rights and concessions for the sale or distribution of food and beverages" are reserved to lessor, and lessor, "its vendors, employees and agents may conduct said business and sell and dispense food and beverages during the hours of tenancy."

By an agreement contemporaneous with the lease, plaintiff agreed with three individuals to pay them, for services in procuring the lease, five per cent of "the gross receipts accruing from all professional boxing bouts, contests and exhibitions", less taxes. Thus ten per cent in the aggregate was payable by plaintiff under the two contracts. Defendants are successors in interest to both lessor and these individuals, and in these capacities receive ten per cent.

The current lease of April, 1943 was preceded by a similar five-year lease, dated April 1, 1941, between the same parties, which contained the same provision, above quoted, for "the privilege of broadcasting" and allowing plaintiff "to install Western Union wires direct to the ring." In October, 1947 lessor was dissolved and by a liquidating dividend distributed its assets, including the current lease, to defendants, who were the owners of all its capital stock.

During 1945 plaintiff "broadcasted boxing bouts over the entire United States under the sponsorship" of a hat manufacturer, which paid plaintiff a sum varying between $1000 and $1250 each week for ten consecutive weeks. Plaintiff also "conducted a world's championship boxing match and exercised the privilege of having sports writers from the leading newspapers of the country telegraph the blow-by-blow description to their various home papers * * * in the various large cities of the United States". The bill alleges that: "Recently the art of broadcasting has developed to a point where, by the improved use of electric pulsations or * * * waves, the broadcasters not only can transmit sound but also can transmit sight, that is, transmit visually the fight itself within a limited radius." In short, television has become commercially practicable. Plaintiff "is in a position to have the boxing bouts broadcasted by television", but defendants refuse to permit plaintiff "to broadcast the boxing bouts by television". Plaintiff has never included its receipts from broadcasting in the computation of percentages, payable by it under the two agreements, of "the gross receipts accruing from all professional boxing bouts, contests and exhibitions". Defendants do not concede that such receipts need not be included in such computation.

The question presented is whether, by the true construction of the lease of October, 1943, plaintiff has "the privilege of broadcasting the boxing bouts" by television. What does the word "broadcast" mean in this context?

In 1888 the verb "broadcast" was defined: "1. To scatter (seed, etc.) abroad with the hand. [Use in 1813 quoted.] 2. fig. To scatter or disseminate widely. ["The * * * doctrine * * * has been broad-cast." 1829.]" Oxford Dictionary. By 1933 it had acquired another more specific meaning: "3. To disseminate (a message, news, a musical performance, or any audible matter) from a wireless transmitting station to the receiving sets of the listeners. [Uses in 1921, 1922, 1923

and 1924 quoted.]" Oxford Dictionary, 1933 Supplement. Substantially the same literal, figurative and specific meanings are given in more recent dictionaries. *Cf.* The New Century Dictionary (1936); Funk and Wagnalls' New Standard Dictionary (1949); Webster's Unabridged Dictionary (1936, 1946); Webster's International Dictionary (1943); American College Dictionary (1947). Webster's adds a specific meaning (to plow in a certain way) with reference to agriculture. In the American College Dictionary the radio meaning is the one first mentioned. We have been referred to no definition, and have found none, of "broadcast" as meaning to transmit by television. The Standard so defines "televise" and "telecast", which in the American College is defined as meaning to broadcast by television. Doubtless the word "broadcast", in its general figurative sense or in its specific radio sense, figuratively used, can, with a limiting context (*e. g.*, "broadcast by television"), be applied to television. It may often have been said, with reference to telegraph or newspapers, that news, gossip, a baseball game or a prize-fight was broadcasted, or with reference to a loudspeaker or amplifier, that a speech was broadcasted. The parties to the lease now in question, who were engaged in the boxing industry, not in radio or television science, art or business, did not indulge in figures of speech or in coining new words or new uses of old words. They contracted specifically "to furnish a reasonably adequate loudspeaker" for announcing fights, to allow plaintiff "to install Western Union wires direct to the ring", and to allow plaintiff "the privilege of broadcasting the boxing bouts."

"As of January 1, 1942, there were 9 commercial television stations and 23 experimental television stations licensed." Federal Communications Commission Mimeograph No. 57,820. *Warner, Radio and Television Law*, sec. 72(b) p. 644. In *Norman v. City of Las Vegas*, 1947, 64 Nev. 38, 177 P. 2d 442, 450, a case not similar to the instant case, the court, referring to the word "disseminate", said, "The word creates the same picture

as 'broadcast', which Webster defines as 'to disseminate widely', and whose present popular meaning is identified with radio, which disseminates information to the four corners of the earth." In April, 1941 or April, 1943—or now—the only ordinary meaning of "the privilege of broadcasting the boxing bouts" that has any commercial application at all has reference to radio and not to television.

Plaintiff contends, and the lower court apparently holds, that for each of two reasons plaintiff has the right to transmit its boxing bouts by television: 1. That radio and television operate on the same scientific principle, differ only in details, are two means to one end, and the "privilege of broadcasting" should therefore be construed broadly as including the end by either means and should not be restricted to one means. 2. That if the "privilege of broadcasting" does not include television, then "the exclusive use and possession" of the property leased, independent of paragraph 6, includes all uses not expressly reserved to lessor, and therefore includes both radio and television. We are unable to concur in either of these views.

1. We cannot accept either the premises or the conclusion of plaintiff's first contention. Construction of a contract depends upon the intention of the parties as expressed in the contract. When in plain unambiguous words the parties contract for a specific instrumentality, the courts may not speculate about an ulterior scientific purpose or end and broaden the words of the contract so as to cover different means to the supposed end. The unambiguous words of this boxing contract cover radio and not television. Moreover, even if the contract did contain both general and specific words which left room for construction as to whether the specific should prevail over the general, cf. *Maguire v. State*, 192 Md. 615, 65 A. 2d 299, or vice versa, cf. *Warren v. Fitzgerald*, 189 Md. 476, 486-487, 56 A. 2d 827, 831-832, it would not necessarily follow that because the parties bargained for the actuality of radio rights, they also intended to bar-

gain for the unknown possibilities of commercially nonexisting television rights.

Plaintiff relies upon *Chesapeake & Potomac Telephone Co. v. Baltimore & Ohio Telegraph Co.*, 66 Md. 399, 7 A. 809, 59 Am. Rep. 167, in which it was held that a "telegraph company" incorporated under the general incorporation law of 1868 (before the telephone was invented) was authorized to do a general telephone business and was subject to the regulatory provisions of the general incorporation law applicable to telegraph companies. In that case this court said: "But it is clear, if we take the term 'telegraph' to mean and include any apparatus or adjustment of instruments for transmitting messages or other communications by means of electric currents and signals, that term is comprehensive enough to embrace the telephone. And that the telephone is so embraced within the definition of the telegraph has been expressly decided in England, after the most careful analysis and comparison of the different instrumentalities, and the manner of using them, in the two systems. *Att'y-Gen. v. Telph. Co.* 6 Q. B. Div. 244." 66 Md. 410, 7 A. 810. This definition of "telegraph" was, in the English case cited, a statutory definition in an act of 1869 which gave the Postmaster General the exclusive privilege of transmitting telegrams. In the English case, however, the court also said, "This view does no violence to the common use of language" (6 Q. B. D. 249), citing Webster's Dictionary (1856), and use by Thomas A. Edison of "telegraph" as including telephone. Before arrival of the Morse electric telegraph, the word "telegraph" had been in use for half a century and had had the general meaning (which has now disappeared) of an apparatus for transmitting messages to a distance, usually by signals of some kind [visible or audible, *e. g.* the semaphore]. This Maryland case and this English case, and several others construing state telegraph statutes as applicable to telephone, were distinguished in *Richmond v. Southern Bell Telephone & Telegraph Co.*, 1897, 174 U. S. 761, 773-776, 19 S. Ct. 778, 781, 43 L. Ed.

1162, in which it was held that the act of Congress of 1866, which gave telegraph companies the right to operate "lines of telegraph" over post roads of the United States, had no application to telephone companies, whose business is that of "electrically transmitting, or receiving articulate speech", and that, "It is not the function of the judiciary, because of discoveries after the act of 1866, to broaden the provisions of that act so that it will include corporations or companies that were not, and could not have been at that time, within the contemplation of congress."

When the public policy underlying a statute, or the purpose of a private contract, requires that future acquisitions or discoveries be covered, it is common practice to do so by use of appropriate language, e. g., in bond mortgages covering after-acquired property or in patent licenses covering future improvements. By a statutory definition of "radio communication" as including "the transmission by radio of * * * pictures, and sounds of all kinds" television is covered by the Communications Act of 1934, 47 U. S. C. A. § 153 (b), as it was by the former Radio Act of 1927, 44 Stat. 1162. In case of ambiguity such a policy in a statute is more readily found than such a purpose in a private contract. In *Kalem Co. v. Harper Bros.*, 222 U. S. 55, 32 S. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913a, 1285, it was held that a moving picture of "Ben Hur" is a dramatization of it and therefore an infringement of the copyright of the novel. When the novel was copyrighted, moving pictures were unknown. The opinion, by Mr. Justice Holmes, remarks that pantomime is undeniably drama and would be none the less so if exhibited by mirrors and not by direct vision. On the other hand, in *Manners v. Morosco*, 252 U. S. 317, 40 S. Ct. 335, 64 L. Ed. 590, (opinion also by Mr. Justice Holmes), it was held that a grant, by contract in 1912 (when moving pictures were a familiar mode of representation), of "the sole and exclusive license and liberty to produce, perform and represent" a copyrighted play, did not, in the light of

the context, give moving picture rights, but only the right of regular stage performance. In *Kirkle La Shelle Co. v. Paul Armstrong Co.,* 263 N. Y. 79, 188 N. E. 163, 165, by a contract made when "talkies" were unknown, the plaintiff acquired an interest in the profits from production of a copyrighted play and a right to have all contracts affecting the dramatic rights "(exclusive of motion picture rights)" submitted to him for approval. It was held that "talkie" rights could not be said to be within the contemplation of the parties either as a subject for the transfer of an interest therein or as included in the "motion picture rights" specifically excepted. *Contra,* in *L. C. Page & Co., Inc. v. Fox Film Corporation,* 2 Cir., 83 F. 2d 196, 199, it was held that a grant by contract, when "talkies" were not commercially known, of "the exclusive moving picture rights" in a copyrighted novel, included "talkie rights".

In the instant case, to repeat, "the privilege of broadcasting boxing bouts" did not in 1941 or 1943—and does not now—include television.

2. Defendants contend—and plaintiff denies—that the "lease" in question is not really a lease, but is only a license to make occasional, non-continuous use of the premises for limited purposes. These opposing contentions, which might be material in a suit by a stranger (*e. g.,* for negligence with respect to use or condition of the premises), are immaterial as between the parties to the contract and involve inverted reasoning. Whether the contract is a lease or a license depends upon the intention of the parties; it is not a guide to ascertaining their intention.

We agree with defendants that the provision in the lease for "exclusive use and possession" by plaintiff is so qualified (not to say contradicted) by other provisions (quoted or mentioned above) that plaintiff has "exclusive use and possession" only for the limited "purpose and use intended", *viz.* "promotion and staging of boxing bouts", and subject to concurrent use and possession by lessor for the exercise and performance

of its own rights and obligations under the contract, including the "business" of "sale or distribution of food and beverages". Any residuum of plaintiff's "exclusive use and possession", over and above conduct of its boxing business, is less than nil. Moreover, express provision in paragraph 6 for "broadcasting" by radio, newspaper and loudspeaker would be useless and meaningless if plaintiff's "exclusive use and possession" included all radio, television and other "broadcasting" rights.

Plaintiff and the lower court say that under the lease either plaintiff or defendants must have television rights, and if defendants have them, they may be exercised to the destruction or damage of plaintiff's radio rights. This does not follow. It has been held in analogous cases that there is an implied obligation on the part of a grantor not to exercise ungranted rights to the detriment of granted rights. *Manners v. Morosco, supra* (holding that a copyright owner could not exercise ungranted moving picture rights without the consent of his grantee of dramatic rights); *Kirke La Shelle Co. v. Paul Armstrong Co., supra* (holding that a grantor of an interest in dramatic rights could not dispose of ungranted "talkie" rights without accounting for the proceeds with his grantee).

In the instant case, to paraphrase Judge Hough's language in *Harper Bros. v. Klaw*, D. C. 232 F. 609, the result is that neither party to the lease can "broadcast" the boxing bouts by television except by bargain with the other.

> *Decree reversed and bill dismissed with costs.*