## U. S. NAVAL ACADEMY ALUMNI ASSOCIATION ET AL. *v.* THE AMERICAN PUBLISHING COMPANY

[No. 142, October Term, 1949.]

152

*Decided April 14, 1950.*

The cause was argued before MARBURY, C. J., COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*John D. Alexander* and *James R. Crook, Jr.*, with whom were *Samuel K. Dennis, John G. Rouse, Jr.*, and *James C. Morton, Jr.*, and *Constable & Alexander* on the brief,

for the appellants.
*William J. McWilliams* for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a judgment of the Superior Court of Baltimore City for $17,811.09, in favor of The American Publishing Company, in a case tried by the court without a jury. The court denied a counterclaim filed by the appellant and entered judgment for costs. The suit was for an unpaid balance of $21,000.65, alleged to be due under a profit-sharing contract dated January 30, 1945 in connection with the publication of the 1945 and 1946 editions of the Register of Graduates of the Naval Academy. The counterclaim, in an identical amount, was based on an alleged miscalculation of the net profits due to (1) the failure of the plaintiff to allow any deductions for overhead and expenses, or publishing costs, of the defendant for the editions from 1938 to 1944 inclusive, and (2) the failure to allow proper deductions for publishing costs of the 1945 and 1946 editions. The questions presented are whether the deductions are permissible under the series of contracts between the parties, and, if so, whether they are substantiated by the evidence presented.

The American Publishing Company is not a publisher in the strict sense, but is engaged almost exclusively in the solicitation and sale of advertising for publications issued by schools, alumni associations, athletic associations, trade associations and the like. The Naval Academy Association performs the usual functions of an alumni organization, and for some years has published "Shipmate", a monthly magazine devoted to naval affairs and

activities of the alumni, and the "Register", which is a roster of the alumni by year, class standing, rank and address, kept up to date with each annual issue. Prior to 1935 it had attempted to publish a Register without advertising, but found it a losing proposition. Prior to 1945, when it acquired the Ogle House in Annapolis, it occupied one small room in the Naval Museum.

In 1935 the parties entered into a written contract whereby the Company was constituted sole publishing agent·for the sale, distribution, and advertising to appear in the Register. All letters soliciting advertising, the prospects to be solicited, and the form of the advertisements were subject to approval by the Association. The Company agreed to attend to all details of advertising copy, billing and collections, and to arrange for the sale of the Register at $1.00 per copy. After an allowance to the Company of 25 per cent of advertising proceeds for the cost of solicitation, and 10 per cent for Company expenses in procuring advertising, it was provided in Item 5(d) that "after the deduction of the expenses which shall include the cost of printing, overhead and expenses, the net profits from the sale of advertisements and the net profit from the sale of Registers shall be equally divided between" the parties. The Company was also to be allowed a bonus of 5 per cent on all advertising in excess of $20,000. The Association agreed to compile the Register, and to assist the Company by furnishing leads for, advertising, signing solicitation letters, and forwarding answers to solicitation and subscription letters.

A new contract, identical in terms, was executed in 1937, to run for four years. However, another contract was substituted in 1940, paragraph two of which provided: "The Association shall be the publisher of the Register, and shall have the entire right to solicit subscriptions for, to sell, and to retain the proceeds of sale of, copies of said Register." Paragraph 3 provided: "The Company shall have the exclusive privilege of, and shall be the sole agent for, soliciting and selling adver-

tising in all issues of the Register published by the Association during the life of this agreement." Paragraph 6 provided: "The Company shall attend at its own expense to all matters incident to the solicitation and sale of advertising in the Register, the securing of advertising copy therefor, and the billing and collection of all amounts payable by the purchasers of said advertising."

Paragraph 7 provided that the Association should pay the Company "as entire compensation", (a) 36½ per cent of all revenues received by the Association from the sale of advertising by the Company, (b) an additional 5 per cent of all advertising revenue in excess of $20,000, and (c) 50 per cent of the "net proceeds from the sale of advertising * * * to be computed by subtracting from the total revenues received by the Association from the sale of advertising by the Company (I) the amounts paid or payable to the Company under sections (a) and (b) of this paragraph, and (II) the total cost and expenses of printing and publishing * * * the Register." Paragraph 9 provided that the Association should compile the Register.

A new contract was entered into in 1945, in substantially the same terms, except that the percentage of advertising revenues going to the Company was reduced from 36½ to 35 per cent, and the "bonus", or additional percentage of revenues in excess of $20,000, was reduced from 5 to 2½ per cent for the 1945 issue, and eliminated thereafter. The agreement was to run until 1948, with option of yearly renewal thereafter.

At the conclusion of the testimony, the court admitted all testimony taken subject to exception, found that the contracts all formed a single series, and held that the contracts should be interpreted in the light of the conduct of the parties. Since during the period of ten years the Association never demanded reimbursement or credit for any of its general or particular expenses in connection with the compiling and publishing of the Register, but on the contrary accepted and paid the statements and bills rendered, the Court held that this was a practical

construction of the contracts by a course of dealing. Allusion was also made to the fact that no auditor for the Association ever raised the point until suit was filed, and that the counterclaim was an "afterthought". Testimony that in 1943 and 1944 the Company agreed to allow, but charged instead of crediting, certain clerical expenses of the Association, was held to be immaterial in view of the undisputed testimony that these were "donations" to cover a loss from the publication of "Shipmate". However, the court ruled that these amounts were allowable, reducing the claim by about $3,200. The court also remarked that the testimony of Mr. Hackeling, the auditor who set up the counterclaim, was "very weak" and "it might have been proper to rule out his allocation on the ground that he did not have enough information to know, really, what was done."

Assuming, without deciding, that testimony as to the whole course of dealing between the parties was admissible, we do not agree that this course of dealing was controlling on the question of interpretation. The rule is well established that it is only in cases where the words of a contract are ambiguous that conduct may affect their construction. In *Products Sales Co. v. Guaranty Co.*, 146 Md. 678, 682, 127 A. 409, 410, Judge Urner, speaking for the Court, said: "It is argued that a different interpretation of the contract is required because during the course of a long series of settlements under its terms the interest and other charges deducted by the plaintiff were calculated upon the face value of the accounts which had been assigned. If the agreement were ambiguous as to the basis of the charges, the conduct of the parties could be considered upon the question as to its proper construction. But as there is no uncertainty in its provision as to the amounts upon which the interest and additional compensation must be computed, the submission of the defendant to erroneous exactions in the course of the previous accounting should not control our decision as to the meaning and effect of the contract in regard to the liability asserted in this action." The

same prerequisite was recognized in *Hurt v. Pennsylvania Threshermen, etc., Casualty Ins. Co.*, 175 Md. 403, 2 A. 2d 402; *Mattingly Lumber Co. v. Equitable, etc. Association*, 176 Md. 403, 409, 5 A. 2d 458; *Saul v. McIntyre*, 190 Md. 31, 36, 57 A. 2d 272, 274, and *Norman v. Century Athletic Club*, 193 Md. 584, 69 A. 2d 466. See also *Williston, Contracts*, (Rev. Ed.) § 623; *Restatement, Contracts*, § 235 (e), comment (h). The evidence in the instant case could not support an inference of subsequent modification. Nor do we find any ambiguity in the relevant provisions of these contracts.

The relevant clause in the first contract is: "After the deduction of the expenses which shall include the cost of printing, overhead and expenses, the net profits * * * shall be equally divided * * *", and in the later contracts the division is to be: "50% of the net proceeds from the sale of advertising * * * to be computed by subtracting * * * the total cost and expenses of printing and publishing * * * the Register." In short, there was to be an equal division of net profits or net proceeds between the parties, and in determining the net figure, the "overhead and expenses" or the "cost and expenses of * * * publishing", were to be deducted. As a matter of fact, no such items, except the amounts paid to the printer and the "donations" above mentioned, were ever deducted. It can hardly be contended that these phrases had reference solely to the expenses of the Company and not to the Association, for the latter was clearly described as the compiler and publisher, and the expenses of the former were taken care of by percentages of the gross proceeds. There is no such ambiguity in the words as to warrant their elimination from the contracts. They must be given their ordinary meaning. "The meaning of the contract cannot be stretched by acts of the parties beyond what the language will bear." *Restatement, Contracts*, § 235 (e), comment (h), *supra*. See also illustration 12.

But although the words must be given their usual meaning, the burden is on the Association, asserting the counterclaim, to produce evidence to support it. It

158

is undisputed that throughout the whole period of the contracts the Company made the arrangements with the printer and attended to all of the details. The Association maintained and kept up to date a card index file of some 20,000 alumni for its own purposes, and it is conceded that it would have kept this file whether the Register had been published or not. The method of compiling the Register was to take a published copy for the previous year, cut it up and put it on sheets and make corrections from the file. This copy was sent to the printer, returned in galley proof, finally in page proof, and proof read by the office force. Since no time sheets were kept, it is impossible to determine accurately the amount chargeable to this activity.

In addition to this compilation work, the Association was engaged in trying to get new members, collecting dues, selling subscriptions to both the Register and "Shipmate", bringing out the latter as a monthly magazine, administering trust funds, running an employment service, and, since the acquisition of Ogle House, running a club with bar and restaurant service. The attempted allocation by Mr. Hackeling of a fixed percentage of total activities to the expense of publishing the Register, is perfectly arbitrary, as the witness admitted. To demonstrate the inaccuracy, it is only necessary to cite the figures allocated to the Register under the heading "office salaries". These varied from $475.75 to $3,905.44, although it is obvious that the time spent in compilation was relatively constant from year to year. Similarly we find a variation in the item of "stationery and supplies" from 50c to $733.16. As the trial court said: "He says he talked to a lot of people—which, of course, is heresay —and that, based on no records, but what he believes to be a reliable estimate, he thinks these accounts ought to have been made another way. * * * The only testimony as to what various employees did which seems to me to be at all persuasive is Admiral Coney's testimony, and that is confined to the last two weeks of the whole period of ten years." We think, as did the trial court, that the

attempted allocation is untenable. In the absence of time sheets, or other evidence above the level of guesses as to the expenses actually incurred, the counterclaim was properly disallowed.

*Judgment affirmed, with costs.*

COLLINS, J., delivered the following dissenting opinion.

The primary question before this Court in this case is whether the U. S. Naval Academy Alumni Association, the appellant, is entitled to a deduction for publishing expenses under the 1940 and 1945 contracts which provided for the deduction of "the total costs and expenses of printing and publishing said issue of the Register."

The expenses of printing and publishing, as pointed out by the appellant, are essentially different. According to the Oxford English Dictionary, Vol. VII, page 1380, to print is "* * * the application to paper, vellum or any similar substance, in a press or machine of inked types, blocks or plates, bearing characters or designs." The definition of publishing in the same volume at page 1562 is "action or business of issuing a book or books * * *." The difference between these two terms is cited in the case of *Daly v. Berry,* 1920, 45 N. D. 287, 178 N. W. 104, at page 106, where it is said: "Publication and printing each have a well understood signification. Publication means to make known, a notification to the public at large, either by words, writing, or printing. Printing means the impress of letters or characters upon paper or upon other substance. The first implies the means of conveying knowledge or notice; the second implies a mechanical act. Any means, therefore, which would give notice to the public of any matter desired to be brought to their knowledge would be classed as publication." See also *Haban v. Suburban Home Mortgage Co.,* Ohio App., 57 N. E. 2d 97, 100, and *State v. Bass,* 1903, 97 Me. 484, 54 A. 1113.

In the case of *Dashiell v. Baltimore,* 45 Md. 615, under the statute the owners of property in Baltimore were assessed with a tax for street paving. The assessment was to include "the expenses of street paving." In that case this Court held that charges for establishing the grade, for advertising and for surveying came clearly within "the expenses" provided in the statute. See also *Fillmore v. Johnson,* 1915, 221 Mass. 406, 109 N. E. 153, and *New York Canning Crops Co-op. Ass'n v. Slocum,* 1925, 126 Misc. 30, 212 N. Y. S. 534.

As to the appellee's contention that the past construction of the contracts by both parties is binding and as no charge was made in previous years for costs and expenses of publication, these cannot now be allowed, a similar question was presented to this Court in the case of *Product Sales Company v. Guaranty Company,* 146 Md. 678, 127 A. 409, 410. In that case the plaintiff, a loaning company, agreed to purchase certain accounts from the defendant, Product Sales Company, for 100% of the net face value thereof, less interest, "77 percent of the net face value shall be paid in cash upon acceptance * * *." Also, a specified percentage on money outstanding was to be paid for the services of the loan company. This Court held that the amount of compensation was to be computed on 77% of the actual value and not on face value, although the plaintiff had offered evidence that the defendant had paid on face value and had submitted to what this Court held to be an erroneous interest exaction in settlements under previous accounting extending over a period of four years. Such erroneous statements in which the compensation had been figured had been paid by the defendant, the Product Sales Company, month after month, year after year, for four years without any protest on the part of the defendant. This Court in that case said through Judge Urner, 146 Md. at page 682, 127 A. at page 410: "It is argued that a different interpretation of the contract is required because during the course of a long series of settlements under its terms the interest and other charges deducted by

the plaintiff were calculated upon the face value of the accounts which had been assigned. If the agreement were ambiguous as to the basis of the charges, the conduct of the parties could be considered upon the question as to its proper construction. But as there is no uncertainty in its provision as to the amounts upon which the interest and additional compensation must be computed, the submission of the defendant to erroneous exactions in the course of the previous accounting should not control our decision as to the meaning and effect of the contract in regard to the liability asserted in this action. *Citizens' Fire Insurance, Security & Land Co. v. Doll*, 35 Md. 89, 6 Am. Rep. 360; *Callahan v. Linthicum*, 43 Md. 97, 103, 20 Am. Rep. 106; *Buffalo Pressed Steel Co. v. Kirwan*, 138 Md. 60, 66, 113 A. 628; 13 C. J. 548; 6 R. C. L. 854." I do not think that because the Naval Academy Alumni Association failed to discover that the expenses of publication had not been deducted for some of the years under the 1940 and 1945 contracts in accounts prepared by the appellee, it is now barred from recovering for those expenses.

The amount sued for by the appellee was $21,000.65. At the trial appellee admitted that in calculating the net proceeds it had failed to give the appellant credit for certain items amounting to $3,189.56. The claim was thereby reduced to $17,811.09. This amount of $3,189.56 included an item of $625 for clerical help to the Association in compiling the Register for 1944 and $1,389.64 for clerical help to the Association in compiling the Register for 1943. The appellee claims that these were donations made by appellee to appellant. This is denied by appellant. A letter of June 3, 1946, from Mr. Guy Moore, appellee's office manager, to Harry England, one of the officials of appellant's corporation, shows that these expenses were recognized as the cost to appellant of compiling the Registers. Part of the letter follows: "Sometime back in February I talked to you on the phone and asked you to let us know the cost of compiling the 1945 Register. I have spoken to you about it a couple

of times since then and Mit [Collins] says he has asked you for the figure at various times." If the appellant was entitled to charge expenses for compiling the Register in 1943 and in 1945 it is clear that the Association should be entitled to charge for the clerical help in compiling the Register for the remaining years under the 1940 and 1945 contracts which would be for the years 1940, 1941, 1942, 1945 and 1946. To publish a Register as large as the one involved in this case containing twenty thousand names and addresses of course requires much clerical work and proof reading. The amount allowed by appellee having been $1,389.64 for 1943 and $625 for 1944, the average amount allowed for those two years would be $1,007.32. I am therefore of the opinion that appellant should be allowed as a counter claim at least this sum of $1,007.32 for each of the years 1940, 1941, 1942, 1945 and 1946, for which this allowance was not made, or a total of $5,039.10. This would reduce the claim of the appellant to $12,771.99. I think part of the salaries of the officers of the Association, postage, stationery and supplies, and telephone and telegraph charges should also be allowed as part of the expenses of publication, but there is not sufficient proof in this case of the amounts expended for those items. Therefore, these amounts could not be allowed at this time but I think the case should be remanded for further testimony as to these costs and also as to the costs of clerical help.