**Irene BARTSCH, Plaintiff,**

v.

**METRO–GOLDWYN–MAYER, INC.,**
**Defendant.**

No. 62 Civ. 3349.

United States District Court
S. D. New York.

July 11, 1967.

Margulies, Heit & Rothenberg, New York City, for plaintiff; Stanley Rothenberg, Monroe E. Stein, New York City, of counsel.

Coudert Brothers, New York City, for defendant; Carleton G. Eldridge, Jr., Eugene L. Girden, John M. Kennedy, New York City, of counsel.

## OPINION

FREDERICK van PELT BRYAN, District Judge:

This action for copyright infringement, brought under 17 U.S.C. § 101 et seq., was tried before me without a jury. The dispute arises out of television exhibitions by defendant of the motion picture "Maytime."

### I.

Most of the factual background is not in dispute and is as follows: On June 1, 1914, certificate of copyright D–37173 was issued to Rudolf Bernauer and Rudolph Schanzer as authors of a dramatic composition "Wie Einst Im Mai" written in German with music by Walter Kollo and Willy Bredschneider.[1] Some time during the 1920's "Wie Einst Im Mai" was drawn upon as the basis for the musical play or operetta "Maytime" which was copyrighted and produced for the theatre.[2] The operetta, with libretto and lyrics by Rita Johnson Young and musical score by Sigmund Romberg, had a highly successful Broadway run.

On January 23, 1930, Hans Bartsch, the late husband of the present plaintiff, obtained exclusive motion picture rights for "Wie Einst Im Mai" from the authors, Schanzer and Bernauer, and from several others owning interests in the composition. This grant in specific terms transferred to Bartsch "the sole and exclusive rights to use, adapt, translate, add to and change the said operetta or musical play and the title thereof in the making of motion picture photoplays, and to project, transmit and otherwise reproduce the said work or any adaptation or version thereof, visually and audibly by the art of cinematography or any other process analogous thereto, and to copyright, vend, license and exhibit such motion picture photoplays throughout the world * * *.[3] On May 12, 1930, Warner Bros. Pictures (Warner) obtained from Bartsch the exclusive right to make a motion picture based on "Wie Einst Im Mai" and "to project, transmit and otherwise reproduce the said musical play or any adaptation or version thereof visually and audibly by the art of cinematography or any process analogous thereto, and to copyright, vend, license and exhibit such motion picture photoplays throughout the world * * *."[4] Defendant Metro-Goldwyn-

1. Pl. Ex. 1; Def. Ex. A, B; Tr. 27.

2. Pl. Ex. 11; Def. Ex. C, F, B; Tr. 9–10.

3. Def. Ex. A.

4. Def. Ex. B. provides in pertinent part: "Owner hereby grants and assigns unto Purchaser, its successors and assigns, the motion picture rights throughout the world, in and to a certain musical play entitled "WIE EINST IN MAI", * * * for the full period of all copyrights and any renewed and extended terms thereof, together with the sole and exclusive right

Mayer, Inc. (M.G.M.) succeeded to all of Warner's rights in "Maytime" and "Wie Einst Im Mai" by agreement dated February 27, 1935.[5]

On October 31, 1935, Rudolph Schanzer assigned to Hans Bartsch all his right, title and interest in the "Wie Einst Im Mai" copyright and all renewals thereof.[6] On January 10, 1938, Rudolph Bernauer made a similar grant transferring all his copyright interest and renewal rights in the work to Bartsch.[7] On October 14, 1941, the Copyright Office issued a certificate of renewal of the "Wie Einst Im Mai" copyright to the authors Bernauer and Schanzer.[8] On October 10, 1942, Bernauer in writing assigned his interest in the renewal copyright to Hans Bartsch.[9] Schanzer made no additional transfer after the renewal copyright was registered; it appears, however, that the prior assignment of October 31, 1935, was sufficient in itself to transfer whatever interest he had in the renewal.

Bartsch died as a New York resident on July 10, 1953. His will[10] was duly admitted to probate on September 3, 1952, and letters testamentary were on that day granted to plaintiff Irene Bartsch.[11] Pursuant to the terms of the will Mrs. Bartsch, as executrix, transferred all of her husband's interest in the "Wie Einst Im Mai" renewal copyright to herself. In this suit for infringement she seeks to enforce rights obtained under this assignment.

The following course of events led to this suit against M.G.M. for an alleged infringement of the renewal copyright: Some time during 1936 and 1937 defendant produced and commenced distribution and exhibition of the motion picture film entitled "Maytime."[12] There is no question that the story of this motion picture is based in whole or in substantial part on the musical dramatic play of the same name written by Rita Johnson Young.[13] The motion picture was first copyrighted on March 18, 1937; a renewal subsequently was issued on March 19, 1964.[14]

On July 6, 1950, M.G.M. obtained a confirmation from G. Schirmer, Inc. of all rights under the "Maytime" renewal copyright—including the right to televise the motion picture.[15] M.G.M. received a similar confirmation from Sigmund Romberg on July 26, 1950, assuring the transfer of all rights under the renewal copyright.[16] This confirmation also specified the right to exhibit "Maytime" over television. On September 11, 1952, however, as the dispute between these parties crystallized, plaintiff confirmed to defendant only whatever rights under the "Wie Einst Im Mai" renewal copyright Hans Bartsch had originally granted to Warner in the original assignment of May 12, 1930.[17] During 1958 defendant M.G.M. commenced licensing the motion picture "Maytime" for exhibition on television.[18] Plaintiff charges that the licensing and exhibition of the "Maytime" film over

to use, adapt, translate, add to, subtract from, interpolate in and change said musical play, and the title thereof, (subject so far as the right to use said title is concerned to Paragraph 7 hereof) in the making of motion picture photoplays and to project, transmit and otherwise reproduce the said musical play or any adaptation or version thereof visually and audibly by the art of cinematography or any process analogous thereto, and to copyright, vend, license and exhibit such motion picture photoplays throughout the world * * *."

5. Def. Ex. C; see Tr. 59.

6. Pl. Ex. 5.

7. Pl. Ex. 4.

8. Pl. Ex. 6.

9. Pl. Ex. 7.

10. Pl. Ex. 8.

11. Pl. Ex. 9.

12. See Def. Ex. D; Tr. 89.

13. Pre-Trial Order.

14. Tr. 89.

15. Def. Ex. F.

16. Def. Ex. G.

17. Def. Ex. H.

18. See Tr. 84.

television constitutes an infringement by the defendant, and she therefore seeks damages and injunctive relief under the copyright law.

## II.

The respective contentions of the parties are quite straightforward. Plaintiff takes the position that the crucial May 12, 1930 transfer of motion picture rights from Hans Bartsch to defendant's predecessor in interest, Warner,[19] did not include the right to exhibit "Wie Einst Im Mai" or "Maytime" on television. For this reason plaintiff contends that any and all television performances constitute infringements of her renewal copyright entitling her to relief.

Defendant M.G.M., on the other hand, takes the simple position that all rights to exhibit the film on television were relinquished by the May 12, 1930 transfer. It urges further that in any event Hans Bartsch made an absolute and unconditional transfer to it of any and all rights of whatsoever nature he received from persons owning an interest in "Wie Einst Im Mai"[20] and retained nothing on which a claim of infringement can be based.[21]

The first narrow issue posed by these contentions is whether the May 12, 1930 grant was broad enough to constitute a conveyance of television exhibition rights. More particularly, the question is whether the right to exhibit "Maytime" on television was embraced in a conveyance of "motion picture rights" authorizing Warner "to project, transmit and otherwise reproduce the said musical play or any adaptation or version thereof visually and audibly by the art of cinematography or any process analogous thereto * * *."

## III.

The parties recognize that the correct disposition of this issue requires a determination of the intent of the principals as manifested in the contract of May 12, 1930. As in Meyers v. Selznick Co., 373 F.2d 218, 222 (2d Cir. 1966), the words used by the parties in this crucial document are hardly so " 'plain and clear' as to exclude proof of surrounding circumstances and other extrinsic aids to interpretation." Accordingly the parties introduced evidence throwing light on the general practices of the motion picture industry in 1930. Unfortunately neither side was able to produce a witness who was directly involved in the negotiations or preparation of the particular grant with which we are directly concerned.

During 1930 the future possibilities of television were recognized by knowledgeable people in the entertainment and motion picture industries. There is no question that upon occasion rights to exhibit motion pictures on television were specifically bargained for and transferred during that year.[22] Plaintiff introduced in evidence several grants to Warner during this period containing a specific reference to the right to televise motion pictures.[23] On the other hand, at about the same time Warner also obtained several broad grants of motion picture rights omitting any specific reference to television.[24]

In the case at bar I do not deem the absence of any specific reference to television in the crucial 1930 transfer to Warner to be of any controlling significance. In the first place, of course, grants and assignments to Warner by others during the same period obviously are not indicative of the precise scope

---

19. Def. Ex. B.

20. Note 3 supra.

21. There is no claim here that the 1930 grant was broad enough to convey to the grantee live television rights. We are concerned only with rights to exhibit the film on television.

22. This was so although the showing of movies on television was not common practice until the 1950's; defendant M. G.M., for example, did not commence licensing its motion pictures for television until 1957. See Tr. 80.

23. Pl. Ex. 18–26.

24. Def. Ex. O, P, Q, R, S.

of Bartsch's grant to Warner, particularly in the absence of any evidence that Bartsch was aware of them. McLoghlin v. National Mohawk Valley Bank, 139 N.Y. 514, 522, 34 N.E. 1095 (1893); Catalano v. J. C. MacElroy Co., 13 A.D. 2d 914, 215 N.Y.S.2d 873 (1st Dep't 1961) (per curiam).

■ Moreover, we are by no means left in the dark as to exactly what bundle of rights was actually embraced by the 1930 transfer. The pertinent language in the contract of May 12, 1930, is strongly suggestive of the conclusion that the transferor Bartsch relinquished "Maytime" television rights. The phrase "to project, transmit and otherwise reproduce the said musical play" appears to represent an attempt by the parties to exhaust all possibilities with respect to the exhibition of the film. It was generally understood in the industry during 1930 that phrases such as the catch-all term "otherwise reproduce" were included in grants of film rights to assure an enlargement of the rights granted.[25] And I have little difficulty on this record in reaching the conclusion that exhibition of the film on television is simply another way of projecting, transmitting and reproducing the play within the contemplation of the 1930 contract. This is true although, naturally enough, the parties who negotiated the grant were evidently not fully aware of the great commercial potential in motion picture entertainment through the medium of television.

■■ In addition, defendant has established here that the exhibitions of the film on television qualify as reproductions of the play "by the art of cinematography or any process analogous thereto." The art of cinematography means generally the production of "a motion picture in any shape, form, size, color dimension" and thereafter making

"use of that motion picture." [26] The adjective "analogous" in this contract means "corresponding to something else" or "bearing some resemblance or proportion." Webster, New International Dictionary 94 (2d ed. 1954). The exhibition of a film through the television medium is certainly the utilization of a process analogous to or resembling the art of cinematography.

John Whittaker, defendant's well qualified expert witness, fully explained the respective techniques and mechanical operations of exhibiting a film in a theatre as compared with reproduction of a film image on a television screen in the home. His testimony was uncontradicted, since plaintiff did not produce an expert. The processes of theatre and home television exhibition are markedly similar. In a theatre the images in a motion picture film are produced by a projector casting rays of light against a screen. A shutter controls the various degrees of brightness which make up the picture seen by the audience. Similarly, the customary practice for exhibiting motion picture films over television requires the use of a standard projector, sound head and lenses like those which are used in the theatre.[27]

A very small image is projected against a photosensitive electronic scanning system, rather than a standard screen, and the information by a process of transduction is converted into electrical energy, transmitted over the air in electrical impulses, and carried into the home where it is again converted by the viewer's set.[28] The process of "unscrambling" or "descanning" the airwave transmission so as to cast the image on the television screen is quite similar to that which takes place on the theatre screen, except that on the set in the home an electronic shutter, rather than a mechanical shutter, is used to control

---

25. See Tr. 192–196.

26. Tr. 195; see Tr. 147.

27. Tr. 150.

28. Tr. 162; see United Artists Television, Inc. v. Fortnightly Corp., 255 F.Supp. 177, 190 (S.D.N.Y.1966), aff'd, 377 F.2d 872 (2 Cir. 1967).

the picture image.[29] Finally, the audio or sound portions of the film are transmitted entirely by wires in the theatre, whereas, of course, in television the airwaves necessarily provide part of the medium of transmission between the wires at the beginning and the end of the process. The intervention of the airwaves results in only a split-second hiatus and does not prevent the receiver at home from communicating the sound just as rapidly as the transmission in a large theatre.[30]

It is evident, therefore, that the process of exhibiting a motion picture over television provides a very close analogy to an exhibition in a theatre. This was true in 1930 from the point of view of the production and commercial end of the motion picture industry.[31] And this is true today from the point of view of the technical and mechanical processes involved, as Whittaker's testimony firmly established. As plaintiff brought out on cross-examination, the only substantial difference between the theatre and home television exhibitions concerns the intervention of the airwaves in the transmission or communication process. While this factor prevents the two processes from being identical, it certainly does not destroy the close analogy between them.

Beyond this, the broad, sweeping phrase "by the art of cinematography or any process analogous thereto," like the expansive terms "project, transmit or otherwise reproduce," was evidently included in the contract as a means of enlarging the grant to Warner.[32] In my view this protective language was sufficiently broad to assure that Warner

obtained the television rights here in issue. This is a case like L. C. Page & Co. v. Fox Film Corp., 83 F.2d 196, 199 (2d cir. 1936), where "the genus embraced the later developed species." I therefore find that plaintiff's predecessor in interest, Hans Bartsch, relinquished all rights to exhibit "Maytime" on television by the express terms of the May 12, 1930 transfer to Warner.

There is yet a further reason why plaintiff cannot prevail in this action. As mentioned, on January 23, 1930, Bartsch obtained from several persons having an interest in "Wie Einst Im Mai" all motion picture rights "together with the sole and exclusive rights to use, adapt, translate, add to and change the said operetta or musical play and the title thereof in the making of motion picture photoplays, and to project, transmit and otherwise reproduce the said work or any adaptation or version thereof, visually and audibly by the art of cinematography or any process analogous thereto, and to copyright, vend, license and exhibit such motion picture photoplays throughout the world * * *."[33] On May 12 of the same year Bartsch turned around and for all practical purposes transferred to Warner any and all rights he had obtained on January 23. With minor variations not here material the May 12 transfer to Warner reiterated *in haec verba* the language delimiting the extent of the rights Bartsch had obtained on January 23.[34] In short, Bartsch transferred to Warner nothing less nor more (i. e., everything) he had received from the prior owners.[35]

"One method of ascertaining what has or has not been transferred is

---

29. Tr. 162, 163.

30. See Tr. 166.

31. Tr. 179–82.

32. Tr. 196.

33. Def. Ex. A.

34. See Def. Ex. B.

35. The only specific reservation to the unqualified transfer to Warner related to

Bartsch's conditional exercise of rights "only in the German language and for the territory of Germany, Hungary, Austria, Jugoslavia, Czecho-Slavia, German-Switzerland, Scandinavia and Holland and none other." These limited German-language rights were later expanded to include the territories of Belgium, Def. Ex. F, and Luxembourg, Def. Ex. J.

to see what has been retained by the grantor." Allied Chemical Corp. v. United States, 370 F.2d 697, 699 (2d Cir. 1967). Since Bartsch transferred to Warner, M.G.M.'s predecessor in interest, everything he obtained from *his* grantors, there was nothing for him to retain. He thus could not have retained the television rights. This is quite consistent with the testimony of Robert W. Perkins who, as counsel to Warner in 1930, approved the contract with which we are concerned upon the understanding that his employer had effectively obtained television rights, a conclusion which was based, among other things, on the identity between what was granted to Bartsch and what Bartsch granted to Warner.[36]

Plaintiff points to a general reservation of rights in the 1930 transfer [37] as evidence of the fact that Bartsch did not specifically intend to relinquish unspecified rights, in particular the privilege to exhibit the film on television. Such a general reservation, however, was by no means unusual in assignments of motion picture rights of this type in 1930,[38] and this particular provision is virtually useless in illuminating the specific intent of the parties as manifested by their contract. Warner obtained nothing more and nothing less than what was specifically relinquished. Bartsch retained nothing more and nothing less than what was specifically reserved. These observations scarcely illuminate the ultimate issue. I therefore find that Hans Bartsch unconditionally transferred to Warner any and all television rights he had secured from those owning interests in "Wie Einst Im Mai."

Since I have found for the defendant on this crucial question of the scope of the grant made in the assignment of May 12, 1930,[39] it is unnecessary to consider the alternative claims that plaintiff is barred by laches and that the motion picture "Maytime," though based in whole or in part on the composition "Wie Einst Im Mai," [40] nevertheless does not constitute an infringement within the meaning of the copyright law.

Judgment will be entered for defendant.

The foregoing opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

It is so ordered.

36. Tr. 204.

37. Paragraph 13 of Def. Ex. B provides: "The rights which the Purchaser obtains from the Owner in 'WIE EINST IM MAI' and/or 'MAYTIME' are specifically limited to those granted herein. All other rights now in existence or which may hereafter come into existence shall always be reserved to the owner and for his sole benefit, but nothing herein contained shall in any way limit or restrict the rights which Purchaser has acquired or shall hereafter acquire from any other person, firm, or corporation in and to 'WIE EINST IM MAI' and/or 'MAYTIME'."

38. Tr. 135–37.

39. Because of the fact that this case turns on the particular language incorporated in the contract defining the rights of the parties, the precedents relied upon are for the most part unilluminating. Ettore v. Philco Television Broadcasting Corp., 229 F.2d 481 (3d Cir.), cert. den., 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956) and Norman v. Century Athletic Club, 193 Md. 584, 69 A.2d 466, 15 A.L. R.2d 777 (1949), are both distinguishable. The grant in *Ettore*, which was held not to effectuate a transfer of television rights, apparently embraced nothing beyond a naked grant of "motion picture rights." *Norman* also turned on the peculiar language of the instrument there involved and held only that television rights were not included within "the privilege of broadcasting" boxing bouts.

40. Pre-Trial order.