**David GOODIS, Plaintiff,**

**v.**

**UNITED ARTISTS TELEVISION, INC. and American Broadcasting Co., Inc., Defendants.**

**No. 65 Civ. 545.**

United States District Court
S. D. New York.

Jan. 2, 1968.

Leo Gitlin, New York City, for plaintiff.

Coudert Brothers, New York City, for defendants.

MANSFIELD, District Judge.

In this suit by the author of a novel entitled "Dark Passage" for damages based on alleged infringement of his copyright (17 U.S.C. §§ 1 and 101) in the novel through television broadcast of a motion picture series entitled "The Fugitive," defendant moves for summary judgment on two grounds (1) that "Dark Passage" is in the public domain, and (2) that in any event defendant is through mesne assignments, the holder of rights under an agreement signed by plaintiff, dated December 20, 1945, entitling defendant to make television broadcasts of "The Fugitive" motion picture film or photoplay series. The undisputed facts are as follows:

David Goodis, the original plaintiff in this action, who died during its pendency,[1] was the author of the novel "Dark Passage." On December 20, 1945 he entered into a written agreement with Warner Brothers Pictures, Inc. ("Warner" herein), defendant's predecessor in interest, granting and selling to it, for the sum of $25,000, broad and exclusive dramatic, exhibition and performing rights in the novel and in any other version that might be published, except for certain specific rights retained to Goodis as "Owner." The rights thus granted by the Owner to Warner as "Purchaser" included the following, described in Paragraph 1 of the Agreement:

"(a) the exclusive, complete and entire motion picture rights, including common law and statutory copyright in the same throughout the world, together with all benefits of the copyright in such writings, the title and the theme thereof, and of all remedies held thereunder, with respect to such motion picture rights;

"(b) the exclusive right to make motion picture versions thereof and to produce and reproduce one or more motion picture photoplays, of every nature, kind and description now or hereafter known, including negatives and positive prints made therefrom (all hereinafter termed 'photoplays') including the exclusive right to show or project, by means of light and/or electricity, on a mirror, screen and/or other surface, pictures, images, and/or photographs in motion, representing scenes and/or action taken from and/or based upon said writings, and/or any adaptations thereof;

\*   \*   \*   \*   \*   \*

"(f) the right in the writings for production and use upon the spoken stage, with actors appearing in person in the actual presence of the audience is reserved to the Owner, but all other now or hereafter existing dramatic, exhibition and other performing rights in the writings, and without limiting the generality of the foregoing, including talking motion picture rights, singing motion picture rights and/or other analogous rights are hereby granted exclusively to the Purchaser, with the full right to use and enjoy the same; subject to the provisions of article 19 below;

\*   \*   \*   \*   \*   \*

"(k) all rights, licenses, privileges and property granted Purchaser under this agreement shall be cumulative, and the Purchaser may exercise and/or use any one or more of said rights, licenses, privileges and property separately from, simultaneously, together or in connection with any other rights, licenses, privileges and property

---

[1] By stipulation dated May 29, 1967, the executors of Mr. Goodis' estate were substituted as plaintiffs, but since the caption continues Goodis as the plaintiff, he will be referred to as the plaintiff herein.

granted or conveyed hereunder. to Purchaser."

As Purchaser, Warner was granted (Par. 17):

"[T]he absolute and unlimited right for the purpose of any photoplays produced or distributed hereunder, to make such changes, variations, modifications, alterations, adaptations, arrangements, additions in and/or eliminations and omissions from said Writings and/or the characters, plot, dialogue, scenes, incidents, situations, action, language and theme, thereof, and the music and lyrics, if any, thereof, in whole or in part, and to add to and include in such photoplays such language, speech, songs, music, lyrics, dancing, choreography, sound, action, situations, scenes, plot, dialogue, incidents and characters as Purchaser, in its uncontrolled discretion, may deem advisable, it being the intention hereof that the Purchaser shall have the absolute and unlimited right to use said Writings and each and every part thereof, for photoplay purposes in any manner it may, in its uncontrolled discretion, deem advisable, with the same force and authority as if Purchaser were the author of said Writings, without in any way being accountable or liable to the Owner for any use it may make of the Writings or any part thereof for photoplay purposes; * * *."

Paragraph 19 (referred to in Par. 1(f), supra) reserved to Goodis, as "Owner", certain specific rights, including the right to present television broadcasts "by living actors" based on the novel (provided such right should not be exercised within 8 years after the release of the *"first"* photoplay produced thereunder), while reaffirming Warner's right to present television broadcasts of *"any"* photoplay or motion picture based on the novel, as follows:

"(b) The right to broadcast said Writings by television from performances given by living actors is reserved to Owner for his use and disposition. However, Owner agrees not to exercise said reserved television broadcasting rights in any country of the world during the period beginning on the date of this agreement and ending eight (8) years after the general release of the first photoplay produced hereunder in such country, or 10 years after date hereof, which ever shall be earlier.

"(c) The Purchaser shall have the right to broadcast and transmit any photoplay produced hereunder by the process of television and by any process similar or analogous thereto, now known or hereafter devised, provided that such broadcasts and transmissions are given from the film of such photoplay and not directly from the performances of living actors."

The agreement (Par. 9) gave Warner unlimited authority to assign the granted rights and the right to such successors or assigns "to make as many motion pictures * * * from such Writings as desired, either as re-makes or as separate original motion pictures." Goodis warranted (Par. 2) that he, as the sole owner, had full authority to grant the unimpaired rights conveyed, including the motion picture rights; that the novel was original and not in the public domain; that he would not do anything to impair the right. He agreed (Par. 2) to indemnify and hold harmless Warner and its successors or assigns by reason of any breach of the warranty thus given.

Goodis further agreed (Par. 21) that after publication of "Dark Passage" in book form by Julian Messner, Inc., in April 1946 he would have it copyrighted in his name and assign the granted rights to Warner Brothers. "Dark Passage" was first published, however, during the summer of 1946, pursuant to Goodis' authorization for a one-time serialization in return for payment of $12,000 [2] in a series of eight installments in The Saturday Evening Post. Although each

---

**2.** Plaintiff could not recall whether any written publication agreement was made.

edition of that magazine bore a notice of copyright in the name of The Curtis Publishing Company, none of the installments of the serialized novel bore any separate notice of copyright. On October 1, 1946 the novel was first published in book form bearing a notice of copyright in Goodis' name, and on the same date Goodis, for the first time, filed with the Copyright Office a notice of claim of copyright in the work. It does not appear that Goodis ever granted or assigned any copyright in the novel, or the serialized version to Curtis Publishing Company. According to Goodis' deposition testimony, he made "a sale to the Saturday Evening Post for serialization". (Dep. p. 27.) In accordance with the terms of his agreement with Warner, Goodis duly executed on August 9, 1947, a short form grant to Warner of all motion picture rights in all copyrights thereto.

Defendant United Artists, the present holder of all rights thus granted by Goodis to Warner under the December 20, 1945 agreement, is the supplier and distributor of the motion picture film series known as "The Fugitive," which is broadcast for one hour each week over the television network of defendant American Broadcasting Company, Inc., pursuant to a license from United Artists.

■ Upon the foregoing undisputed facts, plaintiff is precluded from asserting any copyright in "Dark Passage" for the reason that his grant to the Saturday Evening Post of a license to publish the novel in serialized form, without assignment or sale to it of his rights in the work, followed by general publication of the serialized work in that magazine in July, 1946, constituted a dedication of his rights to the public domain. Egner v. E. C. Schirmer Music Co., 139 F.2d 398 (1st Cir. 1943), cert. denied, 322 U.S. 730, 64 S.Ct. 947, 88 L.Ed. 1565 (1943); Morse v. Fields, 127 F.Supp. 63 (S.D.N.Y.1954). Since the copyright notice filed on October 1, 1946 was not yet in existence at the time of the serialized magazine publication, the notice could not provide the basis for protection for the earlier general publication of the serialized version; and since the Saturday Evening Post was neither the owner nor assignee of Goodis' copyright in the serialized publication, plaintiff could not acquire copyright protection through the general notice and registration of each issue of the magazine. Mail & Express Co. v. Life Pub. Co., 192 F. 899 (2d Cir. 1912); Kaplan v. Fox Film Corp., 19 F.Supp. 780 (S.D.N.Y.1937).

■ While this Court is disposed to strain toward adopting any plausible theory that might avoid surrender or dedication by an owner of his copyright to the public domain, before it can do so some basis must appear. Here there is none. On the contrary, the undisputed record reveals that plaintiff was well aware of his copyright, that he retained ownership of it in himself rather than make any grant or assignment of it to the Saturday Evening Post, and that in the course of his pretrial deposition he did not suggest any error or mistake but frankly conceded that he had agreed to permit the magazine to make a one-time serialization in return for $12,000. Absent the possibility of the magazine's being an assignee, no basis exists, therefore, for adopting a "constructive trust" theory, National Comics Publications, Inc. v. Fawcett Publications, Inc., 93 F. Supp. 349, 353–354 (S.D.N.Y.1950), rev'd on other grounds, 191 F.2d 594 (2d Cir. 1951); Cohan v. Richmond, 19 F.Supp. 771 (S.D.N.Y.1937), or for finding mistake. 17 U.S.C. § 21. To do so would be to stretch protection under the copyright law well beyond established bounds.

■ Even if plaintiff had not dedicated his copyright to the public domain, the unequivocal and undisputed terms of his December 20, 1945 agreement with Warner (to whose rights defendants succeed) require summary dismissal of the present claim. The language of that agreement constituted a broad general grant by Goodis of all motion picture or photoplay rights in "Dark Passage" to

the Purchaser, including all rights required to make a television film series of the type presented on "The Fugitive." Paragraph 1—which contains the principal grants involved—is not limited to one motion picture, or photoplay, as plaintiff urges. On the contrary, it gave the Purchaser the "exclusive right" to make as many motion picture adaptions as it wished, the rights being described as the right "to make motion picture versions thereof and to produce and reproduce *one or more* motion picture photoplays, of every nature, kind or description now or hereafter known" (emphasis added)—including those "representing scenes and/or action taken from and/or based upon said writings, and/or any adaptions thereof" and "all other now or hereafter existing dramatic, *exhibition and other performing rights* in the writings and, without limiting the generality of the foregoing, including talking motion picture rights." It was agreed that all such rights "shall be cumulative".

After thus broadly defining the term "photoplay" in Paragraph 1(b) to include any motion picture version or adaption of the novel, the parties made radio and television rights the subject of the typewritten provision in Paragraph 19 to the effect that Goodis would reserve "the right to broadcast said Writings by television from performances given by *living actors*" on certain conditions, and that "The Purchaser shall have the right to broadcast and transmit *any photoplay produced hereunder by the process of television*", provided such broadcasts should be given from the film and "not directly from the performance of living actors" (emphasis added). It is clear that the motion picture film series known as "The Fugitive" constitute performances of photoplays, as defined in Paragraphs 1(b) and 19(c) and not "performances of *living actors*".

No basis is offered for plaintiff's allegation (Compl. Par. 16) and its contention that the television rights granted under the agreement were limited to "the original motion picture" or to "the

photoplay" made from "Dark Passage." The plain language of the written agreement is to the contrary. It granted television rights with respect to "any" photoplay (Par. 19(c)) and broadly defined the term "photoplay" as stated above. The agreement discloses a clear intent that except for television programs given by living actors, all television film broadcast rights were granted to the Purchaser.

The excision by the parties of the last five and a half lines of Paragraph 1 (f) of the standard printed form agreement, which refers to television broadcasts, is not inconsistent with their clear intent. The excision was made for the reason that the parties more completely articulated their respective rights with respect to radio and television rights in Paragraph 19. In view of this paragraph's precise definition, the excision was required to avoid any inconsistency or ambiguity. Furthermore plaintiff's construction of his rights under the agreement would render meaningless the restrictions put upon live television rights expressly retained by him, since it would give him greater rights in *television film broadcasts* than in live television broadcasts. Although he could not engage in live broadcasts for at least eight years (Par. 19(b)), his interpretation would permit him to compete in the field of film telecasts immediately. This construction of similar agreements has been rejected as illogical. Wexley v. KTTV, 108 F.Supp. 558 (S.D.Cal.1952), affd., 220 F.2d 438 (9th Cir. 1955).

Quite aside from the clear language of the agreement, under New York law (which is expressly made applicable by Par. 13) the broad grant of motion picture rights in Paragraph 1(a) of the agreement, absent explicit reservation, grants television rights in such films. Hollywood Plays, Inc. v. Columbia Pictures Corp., 77 N.Y.S.2d 568 (Sup.Ct. 1947), revd. on other grounds, 299 N.Y. 61, 85 N.E.2d 865 (1949); Bartsch v. Metro-Goldwyn-Mayer, Inc., 270 F.Supp. 896, 154 U.S.P.Q. 616 (S.D.N.Y.1967);

Wexley v. KTTV, supra; cf. Grant v. Kellogg Co., 58 F.Supp. 48 (S.D.N.Y. 1944), affd., 154 F.2d 59 (2d Cir. 1946).

Defendants' motion for summary judgment is granted.

So ordered.