## JAMES A. HAGAN *v.* HARRY A. DUNDORE

[No. 37, October Term, 1946]

*Decided January 8, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Nathan Patz* for the appellant.

*Edward H. Burke* and *Daniel B. Leonard,* with whom were *Bowie, Burke & Leonard* on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

The appeal in this case is from a decree of the Circuit Court for Baltimore County, in Equity, dismissing the cross-bill of the appellant and awarding to the appellee, on his original bill, the appellant's interest in the partnership known as Diecraft Engraving Company at its book value on January 14, 1945. Such value was fixed by the decree at $50,941.55.

The original bill was before this court on demurrer. *Hagan v. Dundore,* 185 Md. 87, 43 A. 2d 181, 160 A. L. R. 117. We there held that a right of preemption, or option to purchase at book value, contained in a partnership agreement terminable at will, survived the notice of termination, and that the option was exercised within a reasonable time thereafter. We expressed no opinion as to what was comprehended within the meaning of the term "book value." In construing the agreement upon demurrer, its validity was, of course, assumed.

By his answer and cross-bill, the appellant raised further questions. He contended that the appellee took advantage of him in procuring his signature to the agreement of May 18, 1944, in violation of the confidential or fiduciary relations then existing and that the agreement was unfair. He prayed that the agreement be rescinded and nullified in its entirety, or alternately, that paragraphs 5 and 6 thereof be reformed and an accounting had on that basis, and for other and further relief. The case went to trial on that issue. In the main, the facts are not disputed, but the inferences to be drawn therefrom are sharply controverted.

The parties to this cause, prior to 1941, were associated in an engraving business known as Hagan Engraving Company. In that year, upon the death of the appellant's brother, they became equal partners by verbal agreement. The business prospered, and in 1943 they moved to larger quarters, changing the firm name to Diecraft Engraving Company, and engaged in war work of a specialized precision character, as subcontractors. Among the articles manufactured may be mentioned a "tuner" for radar sets, and an escape hatch mechanism

for aeroplanes. The business expanded rapidly, and so did the profits.

On April 1, 1944, the partners had a disagreement as a result of which Hagan left the premises and never returned. The true cause of the disagreement remains something of a mystery. The immediate cause seems to have been the presence of two soldiers, friends of Hagan, in the office at about 9 A. M. on that date, who were said to have been somewhat under the influence of liquor. Dundore demanded that they leave, and Hagan left also. According to Hagan, he had been dissatisfied with Dundore's conduct prior to that time. He complained that Dundore had been domineering to him and to the employees, and that he was "fed up" with the bickering and worries connected with the conduct of the expanded business, in which he had an increasingly smaller part. Hagan was the office manager and originally solicited business and kept the books. Dundore was the production manager, and the design and production of the specialized products were under his supervision. He gradually supplanted Hagan in his contracts with the prime contractors, of whom the most important were the Glenn L. Martin Co., Western Electric Co., May Oil Burner Co., Bendix Radio, and Julian P. Freiz & Sons. A Certified Public Accountant was employed, and counsel for the firm was regularly retained. Hagan stated that the business had reached the point where it required technical knowledge which he did not possess and complained that all his decisions were subject to review by Dundore. On the other hand, Dundore disclaimed any intention to belittle or supplant Hagan, and maintained that he at all times was working loyally for the best interests of the firm.

After Hagan left the premises on April 1, Dundore went to see him at his home, and tried to persuade him to return. Hagan refused to do so, and a few weeks later, at the suggestion of Liepman, the attorney for the firm, went to Florida "for a rest." In May, Dundore and Liepman went to Florida to see him. After considerable discussion and examination of a statement prepared by

the firm accountant in Baltimore, the agreement of May 18, 1944, was drawn by Liepman and executed by both parties.

The agreement recited that the parties were equal partners in the business and that they had mutually agreed to dissolve the partnership as of March 31, 1944, Hagan to retire from active participation and Dundore to continue actively in the management. It was also recited that Hagan agreed to sell a portion of his capital interest for $10,000, and that the parties desired to enter into a new partnership agreement as of April 1, 1944.

The agreement provided in paragraph 5 that Hagan should sell "that portion of the book value of his capital interest in said partnership as is represented by the sum of $17,949.50; and the share of the capital interest of the said Harry A. Dundore shall accordingly be increased by the sum of $17,949.50 and the share of James A. Hagan shall be accordingly reduced by the said sum of $17,949.50 in said partnership capital." Paragraph 6 provided that the capital should comprise "the present assets of the business as of March 31, 1944, amounting to $151,788.12 * * * adjusted on the books of said business to conform with the agreements, terms and conditions contained in this agreement. In said adjustment of partner's capital, the sum of $8,352.04 withdrawn by said James A. Hagan from March 31, 1944 to May 5, 1944, shall be deemed by said partners to be capital withdrawals by the said James A. Hagan and shall accordingly be charged against his capital interest."

Paragraph 8 of the agreement provided: (a) that Dundore should be entitled to draw a salary of $20,000 per year, but not in excess of the net profits; (b) that the net profits remaining after salary should be divided on the basis of capital interest, e. g. 65 per cent. to Dundore, 35 per cent. to Hagan. Paragraph 9 gave Dundore an option to purchase, "at any time during the life of this partnership agreement, upon 10 days notice in writing, any portion or all of the interest of James A. Hagan * * * for a sum not exceeding the book value of

the share of the said James A. Hagan." Paragraph 10 provided that if Dundore did not exercise his option and Hagan desired to sell his interest, Hagan should offer his interest to Dundore "at a price not exceeding the then book value thereof represented by his actual capital investment," and Dundore should have the right to pay for the same in ten equal yearly installments. Paragraph 11 provided that Dundore "shall keep or cause to be kept under his supervision, proper books of account of all transactions  *  *  *  and each partner shall at all times have access to and the right to inspect the same." Paragraph 12 provided that "upon the death of either of said partners, or upon the purchase of the interest of said James A. Hagan, in whole or in part, by said Harry A. Dundore, or upon the mutual termination of their partnership and a division of the assets thereof, according to their respective shares, the good will of said business shall not be regarded or valued as a partnership asset." Paragraph 14 provided that all previous partnership agreements between the parties should be terminated and dissolved as of March 31, 1944. Paragraph 15 provided that both parties should be equally liable for any sums which the business might be required to pay in connection with the renegotiation of contracts, or any other claims growing out of the business done prior to March 31, 1944.

After the agreement was executed, Dundore and Liepman returned to Baltimore. In June, 1944, while in Baltimore, Hagan showed his copy of the agreement to an attorney, Stephen Campbell, and discussed it briefly with him. Campbell told him "this thing, in my opinion, can be cancelled at any time," and kept the agreement for further study. On November 7, 1944, Hagan wrote Campbell to mail him the agreement and said: "It doesn't seem likely that anything will happen before the end of the year,  *  *  *." He subsequently paid Campbell a fee of $300 for his advice in connection with the agreement.

On or about December 23, 1944, when Hagan was again in Baltimore, Liepman went to see him, and showed him a

statement prepared by an accountant for the firm, which indicated that in the event of a renegotiation of contracts by the Federal government, applying the methods least favorable to the firm, his capital interest in the firm might be reduced to less than $8,000. Hagan was very upset and went to see Dundore. Dundore told him not to worry, that he didn't think the government would go that far, and if it did, he would pay him $12,000 for his interest. Hagan then consulted his present counsel, and on December 28, 1944, a letter was written to Dundore notifying him that the agreement of May 18, 1944, was terminated and concluded in its entirety, and the partnership thereby purportedly created is hereby dissolved, effective forthwith." Upon receipt of this letter, and after some fruitless negotiation, Dundore, on January 4, 1945, gave notice of his exercise of the option to purchase contained in paragraph 9 of the agreement, and expressed his readiness to pay the book value of the appellant's interest on January 14, 1945. The original bill, with exhibits, was filed on January 8, 1945.

After he left the premises on April 1, 1944, Hagan never evinced a willingness to continue as an active member of the firm. He told Dundore "he was never coming back" and that "he was thinking about going into some other business." Nevertheless, he was entitled to all the rights of an equal partner on May 18, 1944, when the agreement was signed. The mere fact of his leaving did not terminate the partnership. As of that date Hagan had a one-half interest in all the assets including outstanding contracts and good will, subject to liabilities. As was said in *Helvering v. Enright's Estate*, 312 U. S. 636, 641, 61 S. Ct. 777, 780, 85 L. Ed. 1093, "By the terms of the agreement, as would have been necessary anyway, the earned proportion of the unfinished business was to be valued to determine the decedent's interest in the partnership assets." See also *McClennen v. Commissioner of Internal Revenue*, 1 Cir., 131 F. 2d 165, 168, 170, 144 A. L. R. 1127, in which, by the terms of the partnership agreement the retiring partner, or the estate of a deceased partner,

was entitled to receive a share of the entire net profits for eighteen months, in lieu of "The retiring or deceasing member's interest in the capital, the assets, the receivables, the possibilities and the good will of the Firm," to which he would have been entitled in the absence of such a provision.

In the agreement of May 18, 1944, Hagan released his right to an accounting for his half interest in the partnership, retroactive to March 31, 1944, in exchange for a 35 per cent. interest in the capital and future profits of the business. The method of arriving at this result was unorthodox, from an accounting point of view. Hagan asserts that he thought he was selling Dundore his interest in certain tools and equipment carried on the books at $17,949.50, for $10,000, and that the sum of $8,352.04, which had been paid for his account out of profits after March 31, 1944, and which was treated as a capital withdrawal in the agreement, was to be set up as "a tax reserve," but it is perfectly clear that he fully understood and agreed that, whatever the method, his interest should be reduced to 35 per cent. in exchange for the payment to him of $10,000. He admitted in cross-examination that he knew the agreement reduced his partnership interest to that extent. There is nothing patently unfair in this aspect of the bargain, or in the provision that Dundore, continuing the business, should receive a salary before profits.

The agreement did contain elements of potential unfairness, however, in at least three particulars: (1) in reducing Hagan's interest in capital as well as in profits and losses, from 50 per cent. to 35 per. cent., without any assured chance to recoup capital out of profits through a minimum term of the partnership, (2) in reducing his gross interest in assets, but leaving him a' 50 per cent renegotiation liability, thus making possible a reduction of his net interest below 35 per cent., (3) in providing for purchase by Dundore, in the event that Hagan desired to sell, and payment in installments over ten years without interest on the unpaid balance. The latter provision did not become material. The out-

standing element of unfairness was the fact that under the new agreement Dundore could have immediately exercised his option to purchase Hagan's reduced interest at its book value, excluding good will, and in this way cut off any chance of future profits. It was this absence of any time limitation on the exercise of the option which Hagan, who had no independent legal advice, apparently overlooked. It was not brought to his attention by counsel representing both parties. On the contrary, when he complained that the agreement seemed to be "unbalanced" or one-sided, he was told that "he could get out whenever he wanted to," or that the agreement could be "broken at any time you want," if it did not work out to his satisfaction. He understood this to apply not merely to the option to purchase, but "the whole agreement." Liepman testified that he may have told Hagan that he could "get out whenever he wanted"; that he did not put any time limit in the agreement "to give Mr. Hagan a chance to get out any time he wanted to. The idea was that he would stay and take at least his share of these war profits." Hagan was never advised that the option would survive dissolution, and the possibility that Dundore might exercise his option before any profits accrued was never discussed.

It is not disputed that a confidential and fiduciary relation existed between the parties. "This necessity for good faith and the making of a full disclosure of all important information applies in the case of sale by one partner to another of his interest in the partnership. Such a sale will be sustained only when it is made in good faith, for a fair consideration and on a full and complete disclosure of all important information as to value." 20 R. C. L. p. 878, Sec. 91. In *Welbourn v. Kleinle*, 92 Md. 114, 123, 48 A. 81, 82, a case involving purchase of assets by a surviving partner, this court said that all such purchases, "Are regarded with suspicion, [and] will be carefully scrutinized, and only allowed to stand, if assailed, where they appear to have been reasonable, fair, and just." And in *Cumberland Coal & Iron Co. v. Parish*, 42 Md. 598, 606, C. J. Alvey

said: "It is not necessary to establish that there has been actual fraud or imposition practiced by the party holding the confidential or fiduciary relation;—the *onus* of proof being upon him to establish the perfect fairness, adequacy and equity of the transaction." See also Restatement, Contracts, Sec. 498.

The rule is stated in 3 Pomeroy, Equity Jurisprudence, 5th Ed., Sec. 956, p. 790: "The doctrine to be examined arises from the very conception and existence of a fiduciary relation. While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtained a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and thereby overcoming the presumption." Compare *Lambdin v. Dantzebecker,* 169 Md. 240, 250, 181 A. 353, 102 A. L. R. 277, and *Rogers v. Rogers,* 97 Md. 573, 55 A. 450.

It is well established, in this State at least, that the absence of independent advice is not alone sufficient to make a transaction voidable. *Zimmerman v. Frushour,* 108 Md. 115, 122, 69 A. 796, 16 L. R. A., N. S., 1087, 15 Ann. Cas. 1128. But it is a fact to be taken into consideration. *Gaggers v. Gibson,* 180 Md. 609, 613, 26 A. 2d 395; 3 Pomeroy, Eq. Jur., 5th Ed. Sec. 956b, p. 707; note 123 A. L. R. 1505, and cases there cited. Conversely the receipt of independent advice is an important consideration, particularly where there is evidence of a subsequent affirmance of the transaction. *Myers v. Myers,* 185 Md. 210, 44 A. 2d 455.

But while the agreement, as we have stated, contained elements of potential unfairness, it must be noted that Dundore did not attempt to exercise his option until after Hagan had given notice of dissolution of the partnership. It is not contended that Dundore ever sought to obtain an undue or inequitable advantage. On the contrary, he allowed Hagan to obtain the benefit of large

profits earned subsequent to May 18, 1944, to which he would not otherwise have been entitled. We cannot find from the record any evidence to show that Hagan would have fared better, under a dissolution of the old partnership on May 18, 1944, than under the exercise of the option on January 14, 1945. During the year 1944 Hagan's share of the profits, taking into account the reduction in percentage, amounted to more than $76,000. Moreover, we think the evidence supports the conclusion that Hagan acquiesced in the new agreement. While he had no independent advice on May 18, 1944, he had independent advice in June, and his only reaction seems to have been that it was "unlikely anything would happen before the end of the year." Not only did he recognize the transaction as existing at that time, but after he had consulted other counsel in December, and after seven months under the new contract, he gave notice of dissolution of the new partnership instead of rescission of the contract of May 18, 1944 for unfairness. In legal effect, this was an affirmance of the new contract. See Restatement, Contracts, Secs. 483, 484, 499.

"The theory of the doctrine [of acquiescence] is, that a party, having thus recognized a contract as existing and having done something to carry it into effect and to obtain or claim its benefits, although perhaps only to a partial extent, and having thus taken his chances, cannot afterwards be suffered to repudiate the transaction and allege its voidable nature." 3 Pomeroy, Eq. Jur., 5th Ed., Sec. 965, p. 863. The learned author also states (p. 866) : "The doctrine concerning acquiescence from conduct and lapse of time is applied with special strictness in mercantile contracts, * * * and in agreements of a speculative nature." See also *Krinsky v. Whitney,* 315 Mass. 661, 54 N. E. 2d 36, 40. Assuming that Dundore would not exercise his option, the elements of speculation in the case at bar involved the duration of the extraordinary war profits, and the possible effects thereon of renegotiation. As it turned out, the firm received exceptionally favorable treatment in the latter respect. Hagan was perfectly willing to share in

the fruits of the successful efforts of his partner, without any efforts on his part, until be became alarmed (needlessly as it developed) over the possible effects of renegotiation, whereupon he sought to obtain a settlement under the terms of the old agreement while retaining the benefits of the new one. We think the chancellor was correct in holding that the new agreement should not be set aside under the facts presented.

However, we think the chancellor was in error in his determination of the amount to which Hagan became entitled upon the exercise of the option by Dundore. This amount was computed by accepting the valuation of tangible assets as carried on the books. This valuation did not include the earned proportion of expenses and profits on outstanding contracts, nor did it include the true value of assets specially amortized for income tax purposes. The appellee contends that such a method was required by the agreement, which called for purchase at "book value" and expressly excluded good will.

The term good will has been variously defined. In *Brown v. Benzinger*, 118 Md. 29, 34, 84 A. 79, 81, Ann. Cas. 1914B, 582, this Court quoted the terse definition of Lord Eldon: "The probability that the old customers will resort to the old place" *(Cruttwell v. Lye*, [1810] 17 Ves. Jr. 335, 346) and the definition stated in *Knoedler v. Boussod*, C. C. N. Y., 47 F. 465, 466: "The good-will of a business comprises those advantages which may inure to the purchaser from holding himself out to the public as succeeding to an enterprise which has been identified in the past with the name and repute of his predecessor." In *Rutan v. Coolidge*, 241 Mass. 584, 136 N. E. 257, in an accounting by the surviving partner in a firm of architects, the distinction between an interest in prospective business, embraced within the item of good will, and an interest in outstanding contracts partially performed, was clearly recognized. See also *McClenen v. Commissioner of Internal Revenue*, 1 Cir., 131 F. 2d 165, 144 A. L. R. 1127, and *Mills v. Rich*, 249 Mich. 489, 229 N. W. 462. In *Block v. Mylish*, 351 Pa. 611, 41 A. 2d 731, it was held that the specific exclusion of

good will from an option to purchase did not exclude the interest of the deceased partner's estate in a firm asset, consisting of the proceeds of an insurance policy upon the life of the deceased partner, not carried on the books. We hold that the exclusion of present, as distinguished from prospective, values in the case at bar, was not required by the agreement for the exclusion of good will.

It is strongly urged, however, that the exclusion is required by the option to purchase at "book value." The term is commonly used in contradistinction to market value. *Homer v. Crown Cork & Seal Co.*, 155 Md. 66, 81, 141 A. 425. In *Mills v. Rich, supra* [249 Mich. 487, 229 N. W. 463] it was said: "The 'book value' of a business is based upon the actual cost to the defendant of the stock of merchandise and accounts on hand, less such depreciation as has actually accrued." In *Lane v. Barnard*, 103 Misc. 707, 170 N. Y. S. 946, it was said that "Actual book value" meant "The value of all of the assets of the corporation, not any arbitrary or fictitious value, brought about as the result of some bookkeeping system." In *Corbett v. McClintic-Marshall Corporation*, 17 Del. Ch. 165, 151 A. 218, 222, the chancellor said: "I think the common understanding of men is that what is meant [by book value] is a value disclosed by a statement that reveals the money measure of assets and liabilities as they are shown on the books of the company. So that we come to a source back of the statement, viz., to the books, for an ascertainment of the items and figures from which the book value is ultimately derived."

In *Early v. Moor*, 249 Mass. 223, 144 N. E. 108, 109, 33 A. L. R. 362; the court said: "It is manifest that under the agreement 'fair book value' * * * is to be arrived at by ascertaining the value or net worth of all the assets and deducting therefrom the liabilities." In *Elhard v. Rott*, 36 N. D. 221, 162 N. W. 302, it was held that corporate books and records other than the ledger might enter into the computation, and that accrued interest on notes receivable should be considered even

if not computed and posted in the ledger. See also the cases collected in a note 33 A. L. R. 366.

In the case at bar Dundore was required by paragraph 11 of the agreement "to keep * * * proper books of account of all transactions," yet we have the testimony of Mr. Wooden, a qualified accountant called by the appellant, that the books were not adequate to reflect accurately the assets and liabilities on any specified date, that only a portion of the invested labor cost went through the item "work in process" as an asset, that profits and expenses on contracts on hand were not shown, and that the depreciation charges were only correct in so far as income tax liability was concerned. In short, his testimony was that while the true net worth could be accurately determined from an audit of all the books and records, the statement from the ledger upon which settlement was computed was inaccurate and incomplete.

In regard to depreciation charges, it appears that the fixed assets were amortized as "emergency facilities" at 20 per cent. per year for income tax purposes, under Certificates of Necessity issued by the government, one covering land, buildings and repairs, and another covering machinery and equipment, as authorized by 26 U. S. C. A. Int. Rev. Code, Sec. 124. The artificial nature of this deduction is illustrated by the fact that it was discontinued by Presidential Proclamation No. 2669, on September 29, 1945, and certain elections and adjustments became available to the taxpayer. See *Montgomery, Federal Taxes on Corporations* (1945-1946), p. 889. Wooden testified that land is not subject to depreciation from an accounting standpoint and that a normal depreciation on buildings of the type involved would be 2 per cent. It appears from the record that prior to the issuance of the Certificates of Necessity, depreciation on equipment, tools and machinery was taken on a 10 per cent. basis. We think that the "accelerated depreciation," permitted for income tax purposes, is not controlling in determining the book value of the fixed assets. It may be that depreciation at more than a normal rate could be established by reason of excessive use, or that

obsolescence should be taken into account by reason of the adaptability of specialized equipment or other assets only to war purposes. These are questions to be resolved by the auditors, or by the court, on the basis of the facts presented. We think the special and temporary amortization formula, authorized by the Federal Statute for tax purposes, is not controlling as between these parties.

In regard to the invested labor cost on outstanding contracts, this is definitely an item which should have been carried on the books as an asset to be considered in determining net worth. The same thing is true of the proportion of net profits on such contracts (over and above labor and other costs). "Inasmuch as the retiring partner shared in the expenses of getting the contracts and participated in the risk of undertaking them, it is only fair that he should participate in the profits derived from them." *Montgomery, Auditing, Theory and Practice* (1940 Ed.), p. 541. Such value is distinct from good will, and can be determined from the records and experience of the enterprise, even though not actually set up upon the ledger. The undisputed testimony is that such value is an asset determinable by proper accounting.

We think the appellant is entitled, under the agreement, to have all proper elements of value, exclusive of good will, that can be determined by audit from all of the books and records, included in the computation of book value. We shall therefore reverse the decree and remand the case in order that such computation may be made.

*Decree reversed and case remanded, with costs.*