THE LAND AND SIMMONS COMPANY et al.
*v.* ARCONTI et al., Execs.

[No. 229, September Term, 1959.]

*Decided June 30, 1960.*

*Dissenting opinion filed August 24, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*P. McEvoy Cromwell,* with whom was *C. Gordon Haines*
on the brief, for the appellants.

*George W. Baker, Jr.,* with whom was *Hiram C. Griffin*
on the brief, for the appellees.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a declaratory decree that the proceeds
of a $50,000 insurance policy upon the life of Bart Arconti,
Senior, should be included as an asset in determining the
book value of the decedent's stock in the appellant corpora-
tion, pursuant to the terms of a stock purchase agreement.

There is little dispute as to the basic facts. The corporation
was formed in 1948, and engaged in the general contracting
business. Arconti supplied $5,000 cash, Land and Simmons
$2,500 each. The Company was successful from the start.
Land was President, Simmons a Vice-President and Treas-
urer, Arconti a Vice-President, and the three officers consti-
tuted the Board of Directors. Land and Simmons drew
salaries, Arconti did not. Prior to November 25, 1952, Ar-
conti held 250 shares, Land and Simmons 125 shares each.
On the date mentioned, additional shares were issued on the
basis of three for one.

On January 8, 1952, the Board of Directors adopted the
following resolution:

> "WHEREAS, Mr. Roland E. Land, our Presi-
> dent, and Mr. Paul B. Simmons, our Treasurer and
> Vice-President, and Mr. Bart Arconti, Vice-Presi-
> dent, have given untiringly of their time and services
> during the development of the business of the Com-
> pany; and
> WHEREAS, their efforts have resulted in the

steady growth of the business as evidenced by the increase in book value; and

WHEREAS, the death of any one of these three officers and consequent loss of his services would seriously handicap the company and result in a loss of profits;

WHEREAS, each of them owns voting stock of the company; and

WHEREAS, the sale of their stock to outsiders would endanger seriously the future operation of the business; and

WHEREAS, the company's cash position might be such that the company could not act as the purchaser of all or part of their stock; and

WHEREAS, the Board of Directors deems it advisable in the best interests of the company to take steps to protect the company against their premature loss and against the company's inability to pay for their stock,

NOW THEREFORE, be it RESOLVED, that the company enter into an agreement with these Stockholders providing that on the death of any one, the corporation will buy and his widow or estate will sell his holdings in the common stock of the company, and

RESOLVED FURTHER, that the company procure term insurance policies on the life of Mr. Roland E. Land, the President, in the amount of $25,000, Mr. Paul B. Simmons, Vice-President & Treasurer, in the amount of $25,000, Mr. Bart Arconti, Vice-President, in the amount of $50,000.

RESOLVED FURTHER, that the Treasurer of the company be authorized and directed to pay the premiums on such policies of insurance as they become due. * * *."

In February, 1952, the Company procured insurance as directed, as the owner and beneficiary. The policy on the life of Mr. Arconti was converted into a "twenty pay life" on Feb. 4, 1955, when he was sixty years old. The policies

on the lives of Mr. Land and Mr. Simmons were converted to "twenty-five pay life" contracts on Feb. 4, 1957, when they were 47 and 46 years of age, respectively.

On November 25, 1952, the Board of Directors approved an agreement under seal which was duly executed by the proper officers of the Corporation, and by the three stockholders individually. After reciting verbatim the resolution quoted above, and further reciting, "WHEREAS, it is a part of the plan, under the above Resolution, that life insurance be used as a means of providing all or a portion of the funds with which to finance the purchase of stock in the Corporation held by each of the above Stockholders, in the event of the death of any or all of these Stockholders," the agreement provided:

"(1) On the death of either Roland E. Land, Paul B. Simmons, or Bart Arconti, Sr., The Land & Simmons Company shall purchase, and the decedent's estate shall sell the decedent's stock in the Corporation owned by him at the time of his death, to the extent that they have insurance and other funds available to purchase the same.

(2) The purchase price for any or all stock to be purchased under the terms of this agreement shall be an amount equal to the book value thereof, determined in accordance with accepted accounting practices, at the time of the death of the Stockholder whose stock is to be purchased.

(3) Upon the death of any of the above Stockholders, The Land & Simmons Company shall, within a period of thirty (30) days from the date of the death of such decedent, give written notice to the Executors of his estate, of its election to exercise its right to purchase the stock of such decedent, and shall, except as modified in Item 6, within a period of sixty (60) days from the date of such death, pay for said stock to the estate of the decedent, and the Executor or Administrator, upon receipt of such payment, shall deliver to the purchaser the certificates for said stock.

(4) In order to provide ready funds with which to finance the purchase of the stock from said Stockholders, in the event of their death, The Land & Simmons Company has procured life insurance as follows:

[Here were listed the three policies above mentioned, with Connecticut General Life Insurance Company.]

The above policies are five year term, with the privilege of renewal or conversion, without medical examination, and it is the definite intention of The Land & Simmons Company to convert these policies before the expiration of the five year period. All premiums are to be paid by The Land & Simmons Company.

(5) Should the net book value of the stock of the Corporation increase to a point where it appears that the above insurance will no longer be adequate to purchase the stock from the respective Stockholders at its book value, the Corporation obligates itself to increase said life insurance accordingly.

(6) If, upon the death of any one of the above Stockholders, the amount of the proceeds of insurance in effect on his life under this agreement shall exceed the purchase price of his stock, said excess amount shall belong to the Corporation. If the amount of proceeds of such insurance shall be less than the purchase price to be paid for said stock of any one of the above Stockholders upon his death, the Corporation shall be responsible for paying the balance of said purchase price, which shall be paid within one (1) year from the date of the death of the said Stockholder, and upon such payment, the estate of the said Stockholder shall deliver the stock so paid for, to the Corporation.

(7) If, upon the death of any one of the above Stockholders, he shall have already disposed of any or all of his stock in this Corporation, in accordance with the provisions of this agreement, the ex-

cess of the proceeds of the insurance on his life, over the book value of the stock held by him at the time of his death, shall belong to the Corporation.

(8) A Stockholder shall neither sell nor offer to sell, or otherwise dispose of, to a person not a party to this agreement, any of his stock in the Corporation until he has first offered the same to the other Stockholders, at a price established as directed by this agreement in case of the death of a Stockholder; and each Stockholder shall have the right to purchase the stock of the Stockholder desiring to sell in the ratio that his stockholdings at the time of the offer to sell bear to the total stockholdings of all of the Stockholders except the one desiring to sell. * * *."

[Other provisions implementing the agreement are not here relevant.]

On March 3, 1953, the Board of Directors adopted a resolution directing the President to purchase $10,000 worth of "Key Man Life Insurance" on the life of each, of which $5,000 should be payable to the widow of the decedent, and $5,000 retained by the Company. It is conceded that the proceeds of the $10,000 policy on the life of Mr. Arconti were properly included as an asset of the Corporation, and $5,000 thereof, paid to his widow.

On August 22, 1956, the Board of Directors adopted an amendment to Item 2 of the agreement above quoted, adding the following clause: "* * * but under no circumstances outstanding shares representing 25% of the Company's stock be worth less than $25,000.00 in value or outstanding shares representing 50% of the Company's stock be worth less than $50,000 in value." This was duly executed by the parties. The minutes recited that the "above arrangement was felt to be in the best interest for the benefit of the widows of the Stockholders of the Company, which Stockholders have been responsible for the steady growth of the Company. The above stipulated amounts are covered by insurance in force * * *."

The year end net worth figures (capital and surplus), as shown on the books of the Company, were:

| | |
|---|---|
| 1951 | $ 41,863.77 |
| 1952 | 51,823.75 |
| 1953 | 62,443.12 |
| 1954 | 66,628.72 |
| 1955 | 74,567.37 |
| 1956 | 89,608.27 |
| 1957 | 102,498.61 |

Mr. Arconti died on December 22, 1958, and on January 23, 1959, the Company indicated its intention to purchase the 1,000 shares held by his executors for the sum of $50,000. This price was based upon a balance sheet prepared by the accountants for the Company under date December 31, 1958, which showed a total book value of $96,230.88. The $50,000 insurance proceeds then payable to the Company was in effect excluded in determining the $96,230.88 figure. Although the balance sheet showed the $50,000 as a "life insurance claim receivable," it made an offsetting entry of $50,000 as a "reserve for acquisition of capital stock." A footnote stated "no increase in cash surrender value on the policies covering the life of Bart Arconti is reflected in the above computation."

At the trial of the suit for declaratory relief filed by the executors, the complainants produced two qualified accountants, and proffered the testimony of a third, who testified, in effect, that the $50,000 insurance proceeds should have been included in the computation of the purchase price. They pointed out that under accepted accounting practice, since the premiums were paid out of Corporation funds, and the Corporation was the beneficiary of the policy of $50,000 upon the life of Mr. Arconti, the cash surrender value of this policy should have been shown on the books as a corporate asset, as indeed it was. Upon the death of the insured, the proceeds or face value of the matured policy should be shown as a corporate asset. It was not proper to offset the liability to purchase the stock as a deduction, because such purchase would result in the acquisition of treasury stock which should be carried at cost. Even if this stock were retired, the shares

of the surviving stockholders would be enhanced in value, to the extent of the cash proceeds of the policy used for the purpose of the retirement. They fixed the purchase price, on the basis of book value at the time of death at $71,765.64, rather than one-half of the figure arrived at by the Company accountant, which was brought up to $50,000 under the amendment to Item 2.

The accountant called by the defendants did not seem to differ as to the correct accounting practice. He did not deny that the proceeds of the matured policy was a corporate asset. But he took the view that the question whether the $50,000 should be included or excluded would depend upon the intention of the parties, and that was a legal question, not to be resolved by accounting procedure. He declined to express any opinion as to the proper construction of the agreement. He did not think the phrase "book value determined in accordance with accepted accounting practices" was controlling, since either treatment would be proper if specified in the agreement.

For present purposes we may assume that the meaning of the term "book value", which is generally understood to be the value indicated by the excess of assets over liabilities as shown by the books, would not be materially altered by the addition of the words "determined in accordance with accepted accounting practices." The cases, in this State and elsewhere, seem to be in accord on the proposition that if the items actually entered on the books are erroneous, or do not reflect the true state of affairs, adjustments may properly be made on the basis of an audit of all the books and records to accurately determine the net worth. See *Hagan v. Dundore,* 187 Md. 430, 443, and *Aron v. Gillman,* 128 N. E. 2d 284 (N. Y.). See also the cases collected in a Note 51 A.L.R. 2d 606, superseding the Note in 33 A.L.R. 366. Thus the mere fact that it would be necessary to recompute the book value following the death of the insured would not be a fatal objection. The policies were in the possession of the Corporation, and in fact their cash surrender value was carried on the books, as we have noted.

The appellees strongly rely upon the cases of *Block v.*

*Mylish,* 41 A. 2d 731 (Pa.), cited in the *Hagan* case, *supra,* and *Rubel v. Rubel,* 75 So. 2d 59 (Miss.). These cases held that the proceeds of a policy upon the life of a deceased partner, payable to the partnership, should be included in the purchase price of the share of the deceased partner, at book value or a percentage of book value, under an option to purchase. We think these cases are directly in point, and not distinguishable on the ground suggested by the appellants, that the agreements referred to a complete inventory of assets, or all assets. The term "book value" would seem to imply a complete inventory, in the absence of other language from which an intention to exclude could be gathered. Moreover, the expression "at the time of death", would hardly permit the use of a statement prepared on the basis of a time antecedent to the death.

Nor do we think the situation is any different in the case of a partnership and in the case of a corporation like that in the instant case. In 2 O'Neal, *Close Corporations,* § 7.26 the author states: "Whenever a corporation, in order to fund a stock-purchase agreement, takes out insurance on the lives of its stockholders and pays the premiums on the policies, each shareholder of course indirectly pays part of the cost of the insurance on the lives of his fellow stockholders. Therefore, unless the value of the insurance is taken into consideration in fixing the valuation to be placed on a decedent's interest, the result of the stock-purchase arrangement is to transfer his interest to the survivors at considerably less than its full value. To determine fairly the value of a decedent's interest generally requires inclusion in the valuation placed on the business of not only the cash surrender value of the policies insuring the lives of the shareholders but also the proceeds of the policies insuring the life of the decedent to the extent that those proceeds exceed the cash surrender value of the policies on his life." See also the discussion of the problem in Davis, *Recent Developments in Business Purchase Agreements,* 94 Trusts & Estates, 284, 329 (1955). There can be little doubt that the value of the decedent's stock is increased *pro tanto* by the maturity of the policy held by the corporation. As Davis points out, the chances of benefit may be ap-

proximately even in the case of stockholders with the same life expectancy. But in the instant case, Mr. Arconti was about fifteen years older than his associates, so that his expectancy was far less. In *Rollman v. Rollman,* 175 Md. 379, 383, a case involving a verbal agreement as to the treatment of the proceeds of policies on the lives of partners, Chief Judge Bond, for the court, referred to the "unlikelihood that either partner would provide insurance on his life for the benefit of the other to the comparative neglect of his wife and family". So, in the instant case, it does not seem likely that Mr. Arconti intended that an asset paid for by the Company, and constituting about one-third of its net worth, should inure to the benefit of his surviving associates rather than his estate. It is the general rule that agreements should be given a fair and reasonable construction, where the language permits. Cf. *Gibbs v. Meredith,* 187 Md. 566, 570, and *Sorensen v. J. H. Lawrence Co.,* 197 Md. 331, 336.

The appellants point to certain provisions of the agreement which, they argue, show an intention to exclude the proceeds. Item 5, they contend, contemplates that the Corporation carry at all times enough insurance to completely fund the stock purchase. It is true that inclusion of the insurance asset would have the effect of requiring a *pro tanto* increase in the amount of insurance carried to completely fund the obligation to purchase, but the calculation would not be too difficult. We think the inference to be drawn from Item 5 is greatly weakened by the fact that in the recitals and in Item 6 there is language clearly indicating that the Company might be required to supplement the insurance by other cash disbursements. The appellants' argument that the agreement was designed to provide "Key Man" insurance, as well as a stock purchase fund, is weakened by the fact that separate provision for that purpose was made in 1953. The appellants also argue that the amendment of 1956, fixing a minimum price at the amount of the insurance, could only have been adopted because the parties believed that the net worth, exclusive of insurance, was less than $50,000. But that does not follow. The purpose of the amendment may have been to increase the amount of the purchase price, or it may have

been to make certain that, regardless of future losses, the estate of the decedent would receive at least the face amount of the policy. The appellants also rely upon Item 8, which fixes the lifetime offer to sell stock "at a price established as directed by this agreement in case of the death of a Stockholder". They argue that this could not include the face amount of the policy. But the reason it could not is simply that the policy would not have matured. There is no suggestion that the price would not include the cash surrender value of the policy. The fact that such values were shown on the books would seem to indicate that the policies were to be treated as assets in fixing the price, whether before or after death. Item 8 tends to support the appellees' theory of the case.

The appellants strongly urge that the chancellor erred in refusing to admit proffered testimony tending to show the real intention of the parties, based on statements made to insurance agents and others by the decedent and the other parties, and testimony of Mr. Land and Mr. Simmons, as to their belief that, in computing the purchase price, the proceeds of the policy of a decedent would not be included. We think the evidence was properly excluded. Extrinsic evidence as to the negotiations leading up to the integrated agreement under seal, cannot vary the terms of that document. Cf. *Bishins v. St. Barnabas Corp.*, 221 Md. 459, 463, and cases cited. Nor can subsequent statements of the parties as to their interpretation, or misinterpretation, of the written documents, vary its terms, under the circumstances here present. Cf. *United States Naval Academy Alumni Ass'n v. American Pub. Co.*, 195 Md. 150, 157. We agree with the chancellor that the words employed are not so ambiguous as to let in testimony to defeat the plain meaning of the language employed, in the light of the circumstances surrounding the execution and the purpose of the parties making the agreement. To do so would write in an exception not to be found in the agreement.

Since we base our conclusion on this phase of the case upon the Parole Evidence Rule, we find it unnecessary to discuss the contentions of the appellants that the individual appellants

were not proper parties, and that the Dead Man's Statute does not apply. Nor do we think the proffered testimony would be admissible on the theory of reformation because of mistake. Cf. *Brockmeyer v. Norris,* 177 Md. 466, 473.

*Decree affirmed, with costs.*

HAMMOND, J., filed the following dissenting opinion, with which BRUNE, C. J., concurs.

Not only did the Court declare that stockholders in a close corporation should provide in a funded buy-sell agreement that the insurance proceeds should become part of the value of the shares of a stockholder who dies (because the Court felt this to be the equitable arrangement), but also, despite strong intrinsic and extrinsic evidence that they did not so intend, went on to decide that the stockholders before us had agreed that the insurance proceeds were to be corporate assets (because the stockholders must have intended what the court thought equitable).

Whether or not close corporation stockholders should do what the Court thought equitable, depends on the particular circumstances and has little to do with the answer to the question presented by the record—did the stockholders of The Land and Simmons Company agree by their integration that the insurance proceeds were to be considered in setting the purchase price of a stockholder who died. To me there was most convincing evidence that they did not.

The written agreement was that the purchase price of the shares of a deceased stockholder should be "an amount equal to the book value thereof, determined in accordance with accepted accounting practices, at the time of the death of the stockholder whose stock is to be purchased." This may be said to be a model of ambiguity in that it is made up of three variables, with no constant. The term "book value" alone, and with the embroidery of "accepted accounting practices," and the phrase "at the time of the death," all are imprecise in meaning and connotation. Taking up the last first, Mr. Justice Harlan, speaking for a majority of the Supreme Court in *United States v. Louisiana,* 363 U. S. 1, 4 L. Ed. 2d 1025,

1036-1037, pointed out what can hardly be disputed—when he said that the phrase "at the time" can mean any of at least three points in time. (The phrase there under consideration was "at the time such State became a member of the Union"). He said: "Indeed, if 'at the time' were to be taken in a perfectly literal sense, it could refer only to the timeless instant before which the consequences of not being a State would obtain, and after which the consequences of Statehood would follow * * *. In short, if the term is to be given content it must be read as referring either to some time before or after the instant of admission or to both times. * * * It is urged that the disjunctive use of the terms 'prior to' and 'at the time,' shows that the latter must have been used to refer to the time after admission, since the phraseology would otherwise be redundant * * *. But, as has already been indicated, 'at the time' inherently can also be taken as referring to the pre-admission period * * *. And, on that basis there would be no redundancy in the phrase 'prior to or at the time' if 'at the time' meant immediately before the instant of admission and 'prior to' referred to times substantially prior to admission * * *."

The meaning of "book value thereof, determined in accordance with accepted accounting practices" likewise is inconclusive. "Despite the very extensive use of the term 'book value' by attorneys and accountants there is no definition that has universal acceptance. Its adoption, as a method of valuation in 'buy-sell' agreements therefore can prove needlessly costly and inequitable." Block, *Book Value Pitfalls in Buy-Sell Agreements,* 95 Trusts and Estates 408. The opinion of the majority in this case rightly points out that the meaning of the term "book value" would not "be materially altered by the addition of the words 'determined in accordance with accepted accounting practices.'" In 2 O'Neal, *Close Corporations,* Sec. 7.24, the author perceptively observes: "Whenever the transfer price of shares is to be fixed by their book value, draftsmen often insert a statement that book value is to be determined in accordance with 'generally accepted accounting practices' or 'standard accounting principles.' As broad alternatives are encompassed within accepted account-

ing methods, *the definiteness which the quoted standards appear to create is rather illusory."* (Emphasis supplied.) Page, *Setting the Price in a Close Corporation Buy-Sell Agreement,* 57 Mich. L. Rev. 655, 664, says: "It is absolutely essential that the agreement spell out exactly what is meant by 'book value,' who is to make the determination of disputed items, and the conclusiveness of that determination. The inclusion of some vague phrase limiting 'book value' in accordance with 'generally accepted accounting practices' or 'recognized accounting principles' is of less than no help since it invites a dispute as to what practices and principles are so accepted and recognized."

The Committee on Terminology of the American Institute of Accountants reporting in the October 1956 issue of the Journal of Accountancy, beginning at page 67 under the heading "Accounting Terminology Bulletin Number 3—Book Value," said that the term book value is loose and inconclusive and decried its use, even though the direction is to determine it in accordance with accepted accounting practice or recognized accounting principles. The Committee went on to point out that the words "book value" are often used in business arrangements documents such as buy-sell agreements, and said: "When used in such documents, the meaning to be ascribed to the term is a question of legal interpretation of the document and appears to depend primarily on the intent of the contracting or other parties rather than on any accounting definition of such term. While such uses of the term are common, they have given rise to misunderstandings and can easily develop into controversies when the intention of the parties is not clear." See also to the same effect 53 Mich. L. Rev. 972, 979; 71 Harv. L. Rev. 687, 692; and annotation "Meaning of Book Value of Corporate Stock," 51 A.L.R. 2d 606, 609.

It seems apparent that the accountant who testified that it would be in accord with accepted accounting practices either to include or to exclude the insurance proceeds as corporate assets, as the intention of the parties dictated, was entirely correct and put the question to be decided in a nutshell.

That the integration of the parties was intended to mean,

and meant, that the insurance proceeds were not to be included as part of book value follows whichever of three possible paths is walked. If the key words of the integration are ambiguous on their face, as has, I think, been shown, or if analysis and interpretation of the integration as a whole reveal it to be ambiguous, the parol evidence that was offered (but rejected below and by the majority) demonstrates that the insurance proceeds were not to be a part of corporate assets and so eliminates any need for resort to presumed intentions relied on by the majority. If analysis and interpretation of the integration shows, as I think it clearly does, that intrinsically it means that the insurance was to be excluded in figuring book value, there is no need to pass to the extrinsic evidence which demonstrates the same thing.

In determining whether the integration as a whole is ambiguous, the tests to be applied are those same objective standards which should be used to interpret the meaning of the integration. *Restatement, Contracts,* Sec. 231 ("Where application to an integration of the standard of interpretation stated in Sec. 230 produces an uncertain or ambiguous result, the rules governing the interpretation of agreements which have not been integrated are applicable"). Section 230, which has been referred to with approval by this Court in *Ray v. Eurice,* 201 Md. 115, 127, and *Weber v. Crown Central Petroleum Corp.,* 214 Md. 115, 120, says the integration means what a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration would take it to mean (unless the application of that standard of interpretation produces an ambiguous result).

Insurance is used in buy-sell agreements to provide money which otherwise would not be available for the purchase of the stock of the deceased holder. The reasonably intelligent businessman would not customarily and normally visualize the use of the fund fortuitously provided by death to increase the value of the thing to be bought with the fund, and, it should not be presumed that he so intended unless he has left no doubt that he did. The pyramiding required to result in enough insurance to provide the net amount of the purchase

price is apparent. Take for illustration an extreme example: A corporation worth $100,000 with A owning ninety-nine shares ($99,000) and B one share ($1,000). If the proceeds of the insurance were required to be added to the corporate assets, it would take $9,900,000 of life insurance on the life of A for B, as the survivor, to wind up with the $100,000 corporation. Guild, *Stock-Purchase Agreements and the Close Corporation* (1960). The cost of sufficient insurance, if it could be procured, often would be beyond the ability of the corporation to provide and would invite federal tax questions as to unreasonable accumulation of surplus.

That businessmen habitually do not plan to have the insurance proceeds become a part of the assets the insurance is to buy is shown by the many buy-sell agreements where the purchase price is to be fixed at an agreed dollar value, by a formula fixed by earnings, or by a formula based on excess profits. *Stock-Purchase Agreements and the Close Corporation, supra,* (pps. 31-32). It is further shown by the number of buy-sell agreements in which the insurance is paid to a trustee who delivers the stock to the corporation and the purchase price (the insurance proceeds which were payable to the trustee) to the estate of the deceased stockholder. In the latter cases there is no question of the insurance increasing the corporate assets since the corporation does not receive the insurance money. There is no real difference in substance and effect between a trusteed buy-sell agreement and one whereby the corporation receives the insurance proceeds under a binding obligation to pay them over to the estate of the shareholder who has died. As between it and its stockholders and their personal representatives, the corporation is a virtual trustee, taking and holding title to the policies, the cash surrender values, if any, and ultimately the proceeds, as a fiduciary and not for its own account.

The contention that there cannot be equity and fairness unless a proportionate share of the insurance proceeds is added to the value of the stock of him who helped pay for the insurance understandably has become a shibboleth of life insurance company literature on the subject, (one example is cited by the majority opinion) and other writers have

pointed out that it is an abstract truth. However, almost all who have written on the subject recognize that buy-sell agreements which do not add insurance proceeds to corporate assets can be, and often are, fair and most effective.[1] In everyday practical operation the "perfect equity" theory generally is specious. The benefits to be obtained by using fully funded buy-sell agreements leads businessmen to take what they can afford, what they can get, and what will do the job they want done. Like the insurance company that issues the policy, each shareholder knowingly gambles on when he will die in relation to his fellow shareholders. The perfect equity talked about could be obtained by each stockholder insuring his own life in sufficient amount, if he can afford to. Then,

1. In Survivor Purchase Agreements and Taxes, 98 Trusts and Estates, 880, 890, the author, speaking of the fact that the holder of a 75% stock interest in a close corporation bears 75% of the cost of the premiums paid by the corporation on buy-sell insurance says:

"It has been suggested that this problem can be solved by including in the valuation formula the cash surrender value of all the insurance policies plus the proceeds from the decedent's policies. If there were numerous individuals involved, this approach might be feasible. However, if there are only two or three individuals the inclusion of the proceeds would increase the value of the business interest making necessary the purchase of even more insurance for funding purposes. Thus, inequities due to premium payments may result, even though the entity approach is used. *But perhaps the risk of such inequities is justified by the greater ease of accomplishing the buyout through the entity.*" (Emphasis supplied.)

"The use of Life Insurance to Fund Agreements Providing for Disposition of a Business Interest at Death," 71 Harv. L. Rev. 687, says in note 34 at page 693, that it is not necessary to include the insurance proceeds as an asset to make the agreed price stand up for tax purposes. "Viewed as of the time of contracting, see note 30, supra, there may have been some other elements of value flowing to the decedent, and, without negating the existence of full and adequate consideration, he may have reasonably thought it worthwhile to forego an allowance in price equal to what would have been his share of the proceeds, especially when he, along with the other parties, considered it necessary and worthwhile to establish a fully funded agreement."

however, when he dies, his estate, subject to Federal Estate tax, would include both the insurance proceeds and the value of the stock and the impact of the tax would whittle away the insurance proceeds bought to pay the tax. One of the benefits of funded buy-sell agreements arranged at arms length is to get cash to pay estate taxes without increasing the value of the estate by the amount of the cash obtained— the very converse of the perfect equity theory—because only the value of the stock is subject to estate tax, and the insurance proceeds are not.

Other practical factors make those who enter into funded buy-sell contracts at arms length forget the perfect equity theory. Generally, those who make them cannot pay for adequate insurance except with money taken from the corporation involved. The pay-out almost always must be in the form of dividend or salary. Either way personal income taxes take so much there are few tax depleted dollars left for insurance purposes. It is generally much easier and more effective to have the corporation pay the premiums from available surplus. While the premiums are not deductible for corporate income tax purposes, they are recognized as paid pursuant to a proper business purpose. Yet there is a real and practical limit to how much insurance most close corporations can afford. Most can pay the premiums necessary to buy insurance enough to pay for actual value of the stock involved but rarely for the additional value added each time more insurance is taken out.

The benefits of the funded buy-sell agreement usually are more than enough to make its participants use it without trying to achieve theoretically perfect equity. Particularly is this true of the older stockholder who (like Mr. Arconti in the instant case) has accumulated enough property to be estate tax conscious and who is planning for the time the tax must be paid. In exchange for paying premiums on insurance, which will not be credited to his share of the corporate assets when he dies, he provides cash (which his estate would not otherwise have) to pay estate taxes without increasing his estate subject to tax. If a stockholder in a close corporation dies without providing funds for the purchase

of his stock, his beneficiaries are at the mercy of the surviving stockholders because usually the stock has no other market. The surviving beneficiaries must choose between a forced sale at a sacrifice price or unwilling ownership participation in the business, with friction almost inevitable as to the wisdom of management, the question of salaries versus dividends, and so forth. The funded buy-sell agreement gives the corporation cash it would not otherwise have to buy stock otherwise almost unsalable. It provides assurance of continuity and harmony of management and, even during the lifetime of the parties, the very existence of the agreement may well exert a stabilizing and reassuring influence on employees, creditors and business associates. A stockholder usually is happy to achieve all these benefits, particularly the assurance of getting in cash at his death the value of his interest as he counts it, without seeking a profit arising from the death.

The reasonably intelligent man would find much persuasive evidence in the integrated agreement to indicate that the parties before us conformed to the norm and did not intend the insurance proceeds to be part of book value. Paragraph 5 provides that if the "net book value of the stock of the Corporation" increases to a point where the insurance in force will not pay for the stock of a deceased stockholder "at its book value", the Corporation obligates itself "to increase said life insurance accordingly." "At its book value," used in reference to a time when insurance proceeds are only prospective, indicates existing book value without thought of increase by the addition of such proceeds. Further, there is no hint, much less specific mention, of increasing life insurance to the point where it will cover not only existing book value but that value added to by the life insurance proceeds. There is available a computation which will give the gross insurance needed to produce a net value made up in part of the proceeds of the insurance (as in the case of a bequest free of inheritance tax where the amount of the tax bequeathed is itself subject to tax and the gross amount of the legacy must be determined by formula—for example, legacy $1,000, tax $7\frac{1}{2}\%$—$1,000 x 100/92.5 equals $1,081 and a tax of $7\frac{1}{2}\%$ of $1,081 leaves $1,000—see *Bouse v. Hutzler,*

180 Md. 682). There is no suggestion of any calculation as to an amount of necessary pyramided insurance; surely it cannot be gleaned from the obligation "to increase said life insurance accordingly."

Paragraph 6 says that if the proceeds of insurance in effect on the life of a stockholder exceeds the purchase price of his stock "said excess amount *shall belong* to the Corporation." (Emphasis added.) There is a clear connotation that the excess becomes the property of the corporation, not that it remains its property, which indicates that insurance proceeds needed to pay for stock were never to be corporate assets. There is a similar indication in Paragraph 7. Paragraph 8 says that a stockholder desiring to sell his stock first must offer it to the other stockholders "at a price established as directed by this agreement in case of the death of a Stockholder." This can only mean at a price equal to book value at the time of the offer. The insurance in effect at the time of the making of the agreement was term insurance with no cash surrender value. Therefore "an amount equal to the book value thereof * * * at the time of the offer," to paraphrase the words used as to value at time of death, could only mean book value determined without reference to insurance or its proceeds or avails.

At this point, if the reasonably intelligent layman were not convinced that the integration meant to exclude insurance proceeds from book value, if he found the writing ambiguous or doubtful on the point, he would, I have no doubt, seek immediately the direct, articulate parol testimony of disinterested witnesses and, if he were told that the law required its rejection in favor of a presumption that the parties intended what the Court thought they must have intended he would react with astonished disbelief. There is no reason to so perplex him for extrinsic evidence in two aspects is admissible in case of doubt and at the worst, from the appellants' point of view (and mine), the integration was ambiguous. Parol evidence was admissible to show the construction put on the integration by the acts of the parties, and also to show otherwise its true meaning.

"Conduct of the parties to a written contract not only may

amount to construction of ambiguous provisions but may evidence subsequent modification of the contract. *Williston on Contracts,* Rev. Ed., sec. 623." *Saul v. McIntyre,* 190 Md. 31, 36, quoted in *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 616-617, and *Solomon's Marina v. Rogers,* 221 Md. 194, 198. To the same effect is *Globe Home Imp'v't Co., Inc. v. McCarty,* 204 Md. 513, 516.

"* * * but where doubt arises as to the true sense and meaning of the words themselves or difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and determined by evidence *dehors* the instrument." *Eastover Stores, Inc. v. Minnix,* 219 Md. 658, 666. *Rinaudo v. Bloom,* 209 Md. 1, 11; *Vary v. Parkwood Homes, Inc.,* 199 Md. 411, 418; *Sommers v. Dukes,* 208 Md. 386; *Restatement, Contracts,* Sec. 231.

The parties before us showed in various ways that they did not intend insurance proceeds to be part of book value. The agreement was dated November 25, 1952. At that time the net worth of the company was some $51,000. If the insurance proceeds were to be added, the half share of Mr. Arconti would, at the very execution of the contract, exceed the insurance on his life. The company explicitly obligated itself to increase the insurance so it would always be enough to fund the agreement and, although its net worth increased from five to fifteen thousand dollars a year—an average of over ten thousand a year, the insurance, over the years, was never increased. This is completely inconsistent with an intent to have insurance proceeds added to corporate assets.

In August 1956 the buy-sell agreement was modified to provide that "* * * under no circumstances [shall] outstanding shares representing 25% of the company's stock be worth less than $25,000 in value or outstanding shares representing 50% of the Company's stock be worth less than $50,000 in value." The net worth of the company was then almost $90,000 and was increasing an average of $10,000 a year. Mr. Arconti's share, if the $50,000 insurance on his life were to be added to the $90,000, would have been $70,000. Mr. Land's and Mr. Simmons' shares, if their $25,000 face value

of insurance were to be added to the $90,000, would have been $28,750 each. What sense did it make to provide that Arconti was to get the full $50,000 and Land and Simmons their full $25,000 each if the insurance proceeds were to be included in determining book value? It made none and obviously they did not so intend. They acted as they did because they knew the book value of their respective interests, figured as they intended, was less than the insurance on their respective lives.

Mr. Arconti, after the execution of the integration, in planning his estate and providing funds to meet death taxes, listed current values of all his assets. The dollar amount assigned by him to his Land and Simmons stock was consistent with the intent that the insurance proceeds were not to be part of book value and inconsistent with an intent that they were to be. Two disinterested and experienced estate counsellors to whom the information was given in the course of business were prepared to so testify.

There was also available the testimony of those same two that at the time the insurance was bought, and also after the execution of the agreement, the expressed intent of all of the parties was that the price of the stock of a deceased shareholder was to be ascertained without reference to the insurance proceeds. A member of the insurance firm that bonded the corporation was prepared to testify that the three stockholders had informed him to exactly the same effect. He obtained the information in the course of his investigation in connection with the issuing of bonds, and regarded the buysell agreement as a stabilizing and favorable business factor.

The parol evidence which should have been admitted, if any doubt remained as to what was intended, makes certain what I believe the integration as a whole also makes clear—that Messrs. Arconti, Land and Simmons did not intend the insurance proceeds to be part of book value.

The cases of *Block v. Mylish* (Pa.), 41 A. 2d 731, and *Rubel v. Rubel* (Miss.), 75 So. 2d 59, which the majority found "directly in point," recognized the rules set forth in this opinion but found them inapplicable on the facts. In each case the Court found evidence of plainly indicated in-

tent in the contract of the parties that the insurance proceeds should be added in proper proportion to the value of the assets to be bought at death. True, a cynic might infer that the Courts, like the majority in the instant case, were persuaded to find that intent because they thought the parties should have so intended. Nevertheless, the specific holding in each case was that the agreement before the Court showed by what it said and did not say a clear intent to include the insurance proceeds. The agreement before us shows a clear intent not to.

I would reverse. Judge Brune has authorized me to say that he concurs in the views expressed herein.