LEVIN, TRUSTEE, *v.* STRATFORD PLAZA, INC., ET AL.

[No. 20, October Term, 1950.]

*Decided November 3, 1950.*

Appeal from the Circuit Court for Prince George's County (GRAY, JR., C. J.).

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*John W. Maher,* with whom were *David S. Allhouse* and *Marshall A. Levin* on the brief, for the appellant.

*LeRoy Pumphrey* and *Harry Friedman* for the appellees.

MARKELL, J., delivered the opinion of the Court.

These are cross-appeals from a decree construing contracts between the parties for the construction of an apartment house project by plaintiff for defendant and referring the case to an auditor to state an account determining the amount due from one party to the other. This is the net result of somewhat unusual and complicated proceedings, which need not be outlined since no jurisdictional or procedural questions have been raised. Pending these appeals plaintiff was adjudicated bankrupt; its case is now being conducted by its trustee

in bankruptcy. Either the bankrupt or the trustee, or both, (as the case may be) will be referred to as plaintiff. The bill was filed against the corporation defendant and Jacob L. Zellan. Zellan is a non-resident, was not served with process, has not appeared and is not before the court except as a witness. The corporation defendant alone will be referred to as defendant.

Harry A. Rosefeld was plaintiff's president and apparently its principal stockholder, spokesman and representative. About October, 1947, a tract of undeveloped land in Prince George's County was purchased by Rosenfeld and associates, Zellan says for about one cent per square foot, and conveyed to a corporation controlled by them. Part of this tract, 62,382 square feet, was on October 27, 1947 sold to Zellan, and on January 5, 1948 conveyed to him, for $17,078.97, about 27 cents per square foot. Zellan was "sold" the idea of the apartment house project, and at the same time the land.

On November 3, 1947 a comprehensive contract was executed between Zellan, as "Owner", and plaintiff, as "Builder". By this contract (1) the Owner authorized the Builder forthwith to engage named architects to prepare commitment drawings and specifications for an apartment house project on the land, as required by Federal Housing Administration for mortgage insurance under section 608 of the National Housing Act, 12 U. S. C. A. § 1743. The Owner agreed (2) upon completion of the drawings and specifications, to sign all necessary applications, furnish all documents and pay all fees required by the Federal Housing Act. The Builder was to have the exclusive right to select the mortgage lender in whose name application was to be filed. The Owner agreed (3) forthwith to pay the Builder $2500 "on account of the Builder's fee hereinafter mentioned", out of which payment the Builder agreed to pay the architects all sums due them for preparing the commitment plans and specifications "in the event the apartment project is not constructed by the Builder; and if the Owner shall elect not to accept the F.H.A. loan, and

shall not construct said project thereunder", the $2500 payment "shall be deemed to be in full payment to the Builder", and to the architects, "of any and all services performed by them for the Owner hereunder, and this agreement shall thereupon terminate and be of no further force and effect". If the commitment of the F.H.A. is issued, and "the Owner elects to have the project constructed under said Commitment", the Owner agrees (4) to engage the architects to prepare final working drawings and specifications and to pay them a fee equal to $65 for each apartment unit in the project and (5) to engage the Builder, "as general contractor, * * * upon the terms, and at the fee", stated, viz., "to pay, or cause to be paid, to the Builder for its services as general contractor in connection with the construction, an amount equal to all 'costs of construction' plus a fee * * * equal to five per cent of such costs of construction", the $2500 already paid to the Builder and the architects to be deducted from their respective fees; "* * * if the Owner elects to have said project built as aforesaid, the Owner agrees to enter into a contract with the Builder, or cause such contract to be entered into by any corporation organized by the Owner to own said project, under which contract the Builder is to be employed as general contractor as aforesaid, at a fee in the amount set forth above. Said contract shall provide that the owner shall deposit in a special trustee bank account with the Builder, from time to time, funds * * * [to] be drawn against by either the Builder or Owner for this project only, * * * in a total amount equal to * * * $800 for each apartment unit * * * in said project, in order to make available to the Builder adequate operating capital for the construction of said project, * * * said fund * * * [to] be in addition to the proceeds of the construction loan insured by the F.H.A., and in part cover the retained percentages thereunder all of which * * * loan proceeds shall also be made available to the Builder to defray the costs of construction of said project. In the event the project is to be owned by a corporation the

construction contract referred to above shall be guaranteed by the parties hereto of the first part, insofar as the same refers to the obligations of the Owner. The term 'costs of construction' as used herein, is hereby defined to mean each and every item of cost, expense of disbursement paid or laid out by the Builder on account of the actual construction and development of said project, including but not limited to, any and all payments of disbursements for labor and material, rental of equipment used in the construction, subcontractor's bills, surveyor's and engineer's fees, utility services, field office costs, supervision, Federal, State and Municipal licenses, taxes, Social Security and Unemployment taxes, insurance premiums, and any and all other expenditures which the Builder is called upon to make necessary to and in connection with the project," with exceptions not now material. The Builder agreed to "take prompt action and use the utmost diligence in obtaining the loan * * * and all the necessary measures to complete all preliminary steps and * * * actual construction * * * in the shortest reasonable time and with the minimum cost to the Owner" and to "build the building in accordance with the plans and specifications and in the most economical, but workmanlike manner. * * * in no event is its total compensation or fee to be more than five per cent of the F.H.A. loan."

The $2500 was paid by Zellan to plaintiff, defendant was organized by Zellan to own the property, and application was filed with F.H.A. On February 24, 1948 F.H.A. issued (on a printed form) its "Commitment for Insurance", a lengthy letter addressed to Metropolitan Mortgage Company, "mortgagee", Zellan, "sponsor", and defendant, "proposed mortgagor", stating that it finds the project to be eligible for insurance under section 608, and subject to its Rules and Regulations and to specified conditions, will endorse as insured a credit instrument, secured by a first mortgage upon the land and property included in the project, in an amount not exceeding $343,800. The conditions specified are many

and lengthy, including delivery to F.H.A. of many instruments, among them "(c) Four conformed copies of the Construction Contract between the Mortgagor and the general contractor whereby the project is to be built (F.H.A. Form 2442-W)." Before May 4, 1948 F.H.A. abandoned this requirement. Plaintiff and defendant, however, did in fact execute such a contract; apparently F.H.A. was not given a copy.

The commitment for insurance was based on F.H.A.'s "Project Analysis", on a printed form, also dated February 24, 1948, which included, *inter alia*, "Estimated Replacement Cost of Property" and "Determination of Maximum Insurable Mortgage", each itemized. Section 608 provides that the insured mortgage "shall involve a principal obligation in an amount— * * * (B) not to exceed 90 per centum of the amount which the Commissioner estimates will be the necessary current cost of the completed property or project, including the land; the proposed physical improvements; utilities within the boundaries of the property or project; architects' fees; taxes and interest accruing during construction; and other miscellaneous charges incidental to construction and approved by the Commissioner: *Provided,* That such mortgage shall not in any event exceed the amount which the Commissioner estimates will be the cost of the completed physical improvements on the property or project, exclusive of off-site public utilities and streets, and organization and legal expenses; and (C) not to exceed $1,500 per room for such part of such property or project as may be attributable to dwelling use: *Provided,* That the Commissioner may increase this amount to $1,800 where in his discretion cost levels so require." Act of May 22, 1946, c. 268, sec. 10, 60 Stat, 214; U. S. Code Anno., Title 12, § 1743, as in effect in 1948 prior to August, 1948. In practice (whether correctly or not) the Commissioner has construed "the *necessary current* cost of the completed property or project" as meaning present "replacement cost", and not actual cost already incurred plus estimated further cost, of a particular

project. Thus in the "estimated replacement cost" land, which a few months ago had cost Rosenfeld about one cent per square foot and had been sold to Zellan for about 27 cents, was included at "fair market price", $30,000, about 48 cents per square foot, and was the basis of a mortgage loan of about $27,000, about 43 cents. The "estimated replacement cost" also included "builder", at 5%, $15,186, "architect", at 5%, $15,945, and "carrying charges; financing:" (*e.g.*, interest, taxes, insurance) aggregating $15,318. Under the contract of November 3, 1947 the total architects' fee would be $2600, *i.e.*, $65 for each of 40 apartments.

The total "estimated replacement cost", including land, was $384,000, 90 per cent of which is $345,600. At $1800 per room, the maximum amount insurable for the project (which contained 191 rooms) was $343,800, the amount of the commitment. Rosenfeld told Zellan (or so Zellan says) he could build the project for less than $1700 per room, it would eventually cost Zellan nothing (over and above the mortgage loan), and Zellan would get "change" out of the loan proceeds, after reimbursement for his cash advances, including perhaps the cost of the land. If Rosenfeld's expectations as to building costs could have been realized, the project (exclusive of land) would have cost much less than $354,000 or $343,800, the speculation would have been a success for both parties, plaintiff would have got a good profit, defendant the entire equity in the project (subject to the 391 month installment mortgage), ultimately without any outlay by either. The purpose of F.H.A. was to stimulate housing construction, not to make profits by insuring sound loans. Cf. *United States v. Emory*, 314 U. S. 423, 435, note 9 to dissenting opinion, 62 S. Ct. 317, 86 L. Ed. 315. This purpose presumably was furthered by making possible such projects of speculators with little capital and no credit.

A "Trade Payment Breakdown", dated April 27, 1948, was signed for defendant by plaintiff's vice-president and accepted by F.H.A. It was prepared by F.H.A. on a

printed form. It contains thirty-four items, aggregating a "Total Estimated Cost of On-site Construction Exclusive of Fees, $325,882", an item "Contractor's Fee" left blank, and "Total Estimated Cost of On-Site Const. Incl. Contractor's Cash Fee (Total Payment Breakdown Items), $325,882." Apparently this total figure had been given to F.H.A. by Zellan or his brother-in-law, Harry Friedman, defendant's secretary and counsel, and the breakdown was prepared by apportioning the total. The breakdown was the proportionate basis for progress payments out of loan proceeds. The F.H.A. estimator who prepared it testified that it "has nothing to do with the contract" to build the building. It is, however, referred to, as an exhibit and "as a part of the contract", in the "construction contract" which was executed on May 4, 1948 and had been required by F.H.A. in such transactions until May 1948, when this requirement was abandoned.

Zellan and Friedman profess to have relied on Rosenfeld's "representations" regarding the venture and "what a wonderful thing it was". Friedman says he "thought it was the opportunity of a lifetime." However, they were not unaware of the risk in a cost-plus building speculation. They insisted on a maximum price. Under the November, 1947 contract Zellan could abandon the project and terminate the contract, without loss or payment other than the $2500 payment and the land purchase, already made. About April 15, 1948 plaintiff and Zellan agreed upon a price of $325,882, which was arrived at by Friedman by subtracting from the amount of the loan ($343,800), the sum of the item "carrying charges; financing:" ($15,318) in the "estimated replacement cost of property" and the architects' fee under the November, 1947 contract ($2600). Although Friedman says he suggested a "ceiling" contract, there is nothing to indicate that Rosenfeld seriously considered a maximum price without a minimum. Friedman and Zellan say Rosenfeld tried to convince them that a cost-plus contract would be better for them than a "lump sum"

contract because they would "have change left over." When the price of $325,882 was agreed upon, a "lump sum" contract, not a "ceiling" contract, was prepared by Friedman and on May 4, 1948 was executed by plaintiff and defendant.

Settlement of the mortgage loan was made at the Washington office of F.H.A. on May 4, 1948. Metropolitan Mortgage Company (of Washington), addressed as "mortgagee" in the "commitment for insurance", acted only as a broker. Irving Trust Company (of New York) was the lender. A letter, dated April 23, 1948, from Friedman to a vice-president of Irving Trust Company and counsel for F.H.A., enumerated as enclosed therewith copies of 18 "papers required in the closing". One of the 18 items contained the note, "Note 1: F.H.A. does not require a Construction Contract. However, there will be an agreement between Republic Engineering Corporation as the builder, and Stratford Plaza, Inc., as the owner, which will be indemnified by Mr. Zellan." Another item was, "contract for off-site improvements between sponsor and contractor to be guaranteed by 100 per cent bond." This contract was required by F.H.A. The contract price for the off-site improvements was $6062. Apparently there is no controversy regarding this contract.

Among many papers executed at the settlement on May 4, 1948 were the off-site construction contract between plaintiff and defendant (not Zellan) and the principal construction contract between the same parties. The latter contract between plaintiff, as "Contractor", and defendant, as "Owner", was prepared on the printed form (F.H.A. Form 2242-W) mentioned in the "commitment for insurance". It is less comprehensive, but much more detailed, than the Zellan contract of November, 1947. It is accurately described in its caption, "Construction Contract—'Lump Sum'." It consists almost entirely of the printed form, with one important insertion and elimination and a few other insertions not now important. It provides that (Article 1—Scope of Work) Contractor

shall furnish all the materials and perform all the work (within the property lines) shown on the Drawings and the Specifications; (Article 2—Time of Completion) the work shall be commenced within 10 days and completed within 14 months from the beginning; (Article 3—the Contract Sum) "The Owner shall pay the Contractor for the performance of the Contract, subject to additions and deductions provided herein on account of construction the sum of *$325,882.00* cash ~~and in addition thereto, as a fee, $——cash and —— shares of the stock of the Owner. By the execution and delivery of this Agreement the Contractor hereby subscribes for the said shares and agrees that services to be rendered by the Contractor hereunder, when finally completed shall constitute payment therefor; Provided, however, that in no event shall the Owner be liable to deliver any of said shares to the Contractor nor shall he Contractor be entitled to exercise any rights as a holder of said shares, until payment is due and payable as herein set forth.~~ [Italics show insert; line through words shows printed matter eliminated]; (Article 4—Schedule of Payments) "the Owner or Lender may withhold approval or final payment until after the expiration of any period which laborers, subcontractors, and materialmen may have for filing notice of Mechanics' Liens, and until after satisfactory completion of all off-site utilities and streets as required by the Lender and Federal Housing Commissioner"; a similar provision in Article 9—Receipts and Releases of Lien; and (Article 12), "Notwithstanding any other provision of this Agreement or the Specifications which form a part hereof, the Contractor shall furnish at its own expense all building and other permits, licenses, tools, equipment, temporary structures, and water necessary for the construction of the Project as required."

Work was begun within ten days after May 4, 1948 and completed about April 10, 1949. On May 4, 1948 a Washington bank account was opened in defendant's name. Either Zellan or Rosenfeld was authorized to sign checks on it. After the instant controversy had

arisen about a year later, defendant revoked the authority to Rosenfeld to sign. On May 4, 1948 Zellan deposited $5,000 in this account, and from time to time thereafter about $20,000 more. On May 4, 1948 defendant received and deposited in this account the first check for part of the loan. All the subsequent loan checks, drawn to the joint order of plaintiff and defendant, except the last, were similarly deposited. After controversy had arisen, defendant demanded and received a check to its order, in lieu of the last one to joint order.

This suit was instituted by plaintiff to impound the last loan installment or prevent defendant from using it, and to enforce the contract of November, 1947 by payment of the balance due on the cost-plus basis. In the bill plaintiff did not mention the May, 1948 contract. When defendant's counsel showed plaintiff's counsel the May, 1948 contract, Rosenfeld denied all knowledge of it, and though he admitted the genuineness of his own signature and defendant's corporate seal, said the signatures must have been obtained by artifice. When asked on cross-examination, "Didn't you tell me that your lump sum contract did not bind you?", Rosenfeld answered, "Never heard of any lump-sum contract whatsoever, and I swear that as sure as I am sitting in this chair to that, and never heard of it at any other time. That is so false that I cannot even express it correctly". In the lower court, as it stated in Judge Gray's opinion, counsel for plaintiff (the bankrupt) argued that the May, 1948 contract "was a mistake and it was executed by reason of, if not fraud, at least deception, with respect to the manner in which it was presented to them and the manner and circumstances under which it was signed." Judge Gray, however, found no evidence of fraud or mutual mistake, and decreed "that the contract between plaintiff and defendant Zellan was fully and completely superseded, so far as the construction of the apartment house project * * * was concerned, by the two contracts of May 4, 1948 between the corporate parties and said two

contracts are the controlling contracts between the corporate parties to this proceeding."

In this court different counsel for plaintiff (the trustee in bankruptcy) abandon plaintiff's contention below, and concede that there is no evidence of fraud or mutual mistake and that the May, 1948 contract is binding on plaintiff. They contend, however, that the May 1948 contract changed, but did not supersede, the November, 1947 contract; that the "costs of construction" in the earlier contract are fixed by the later contract at $325,882, but the "Builder's fee" is not mentioned in the later contract and remains unchanged at 5 per cent. Counsel for plaintiff in this court informs us that they are counsel for subcontractors and materialmen who had claims for some $44,000 against the bankrupt. We assume, without deciding, that this change of position by plaintiff does not amount to asking us to violate the rule that in no case shall we "decide any point or question which does not plainly appear by the record to have been tried and decided by the Court below". (Rule 9; Acts of 1825, ch. 117.)

Plaintiff says the conduct of the parties after May 4, 1948 shows that the November, 1947 contract was meant to remain in force and supports plaintiff's construction of the May, 1948 contract. Under the November, 1947 contract Zellan was obligated to deposit "in a special trustee bank account with" plaintiff (whatever that may mean) from time to time $32,000 ($800 for each of forty apartments) to make available to plaintiff "adequate operating capital for the construction of the project." The May, 1948 contract imposed no such obligation on defendant. Zellan did deposit $25,000 in a bank account subject to check by either Zellan or Rosenfeld—until defendant revoked Rosenfeld's authority. Plaintiff also relies upon books of account, kept by plaintiff in defendant's name, which were to some extent examined by officers and an accountant of defendant. Plaintiff offered in evidence a statement of "cost of construction", apparently prepared from these books, which

shows a total of $423,024.57, including $17,078.97 for land. This statement and the books are not in accord with either of plaintiff's successive positions or defendant's position or with either the November, 1947 or the May, 1948 contract, and throw no light on the construction of the contracts.

In *U. S. Naval Academy Alumni Association v. American Publishing Co.*, 195 Md. 150, 156, 72 A. 2d 735, 738, we reaffirmed the well established rule "that it is only in cases where the words of a contract are ambiguous that conduct may affect their construction". We quoted from the Restatement, Contracts, § 235 (e), comment h, "The meaning of the contract cannot be stretched by acts of the parties beyond what the language will bear". There is no ambiguity in the May, 1948 contract which would justify looking to conduct for construction of the contract. The November, 1947 contract was—or provided for—a "cost-plus" (*i.e.*, cost-plus-percentage) contract; the May, 1948 contract is a "lump-sum" contract. For some years cost-plus contracts have been frowned upon, as encouraging extravagance. They have been largely superseded by cost-plus-fixed-fee contracts. Perhaps the printed form of "lump sum" contract, which provides for two sums, one called "fee", was modeled after a cost-plus-fixed-fee contract. At all events, such a lump-sum-plus-fixed-fee contract is only a lump sum contract with the lump sum separated into two sums. Strictly speaking, a "fee" has no place in a "lump-sum" contract; the contractor works, not for a fee but a "profit", an excess of the lump sum over cost. In the May, 1948 contract the simple method was pursued of naming only one lump sum, which covers everything. Plaintiffs would "construe together" (1) a cost-plus-five-percent contract and (2) a $325,882 contract, as amounting to (3) a $325,882-plus-five-percent contract. This does violence to the words of the contract. If this had been the intent it could have been expressed by inserting in the blank "342,176" instead of "325,882", or by leaving in the contract the printed words "and in addition thereto, as

a fee, $—— cash" and inserting in the blank "16,294", or (without the dollar mark) "five percent thereof".

Our conclusion would not be changed if we should assume that the November, 1947 contract was superseded, not entirely, but only to the extent carefully stated in the decree. The price named in the May, 1948 contract was different from, and necessarily superseded, the price in the earlier contract. But provision for advancing (not paying) $32,000 for operating capital would not change the price or be inconsistent with the price named. In this respect, as has been said, the later contract is less comprehensive than the former. In any aspect defendant could not, by doing more than he was obligated to do, become obligated to do still more than he did.

In one of the "closing papers" (not set out in full), apparently an agreement between defendant and F.H.A., defendant stated or agreed "That upon completion of the project, there will not be outstanding any unpaid obligations, contracted in connection with the purchase of the property, construction of the project, or the mortgage transaction except obligations for the payment of which funds are held by the Mortgagor or Mortgagee and obligations which will be fully paid out of the Mortgage funds." Plaintiff contends that because of this agreement, and apparently also on some other grounds of public policy, it would be illegal or against public policy to permit defendant to escape paying plaintiff enough to pay $44,000 to unpaid subcontractors and materialmen. Cf. *Messick v. Smith*, 193 Md. 659, 69 A. 2d 478; Id., 72 A. 2d 249. This contention is without merit. Primarily at least, the language quoted, like usual provisions in construction mortgages or mortgages to secure bond issues or the provisions in Articles 4 and 9 in the "lump sum" contract itself, is an agreement between debtor and creditor (insurer) for the protection of the lender against defaults by plaintiff. Manifestly it does not require defendant to pay plaintiff for plaintiff's own breaches of the contract between them. If it did, the

"lump sum" contract required by F.H.A. before May, 1948, and used in this case, would not be a lump sum contract but a contract unlimited as to defendant's obligation except by the extent of plaintiff's breaches. We lay aside any possible question whether F.H.A., for the benefit of materialmen or otherwise, might maintain suit against defendant on this agreement. For present purposes, it is sufficient that plaintiff cannot do so.

On defendant's cross-appeal defendant contends that, out of the contract price of $325,882, plaintiff must pay the architects' fee ($2600), interest during construction ($4604.81), taxes, insurance, F.H.A. fees and other items, all aggregating about $10,000 or $15,000. Just what items are claimed, and what amounts, is not clear. These contentions involve essentially the same fallacies as plaintiff's contentions on its appeal, and are, if possible, less plausible. Like plaintiff, defendant relies on conduct of the parties, in that most of the items claimed have in fact been paid by plaintiff out of defendant's bank account in which were deposited all loan proceeds (except the last check) and Zellan's $25,000. As has already been said, conduct of the parties cannot construe unambiguous terms of the contract. Furthermore, the fact that any item was paid out of the bank account could not signify anything as to ultimate liability for the item. The bank account was, in effect, a pool of the capital of both plaintiff and defendant in the joint venture in which they had pooled their hopes. Defendant ultimately was entitled to $17,918 "change" out of the loan ($343,800 less $325,882), in addition to refund of its initial $2500 payment and Zellan's $25,000 deposits. Payments out of the bank account for account of defendant were at most only partial refunds to defendant.

As to construction of the contract, defendant contends that architects' fees, interest, taxes and insurance during construction and similar items are "costs of construction" and are part of plaintiff's undertaking. This contention has no basis in the contract and confuses "construction" with "cost of construction", or contractor's costs of con-

struction with owner's costs of construction. The items mentioned are, as in F.H.A.'s "Estimated Replacement Cost of Property", part of the cost of production or cost of reproduction of a property as a whole, but they are not ordinarily part of a building contract. They are not included in the definition of "costs of production" in the November, 1947 contract, which defendant, strange to say, invokes. Plaintiff undertook to construct the project, *i.e.*, to do the work and furnish the materials, not to pay all defendant's "costs of construction". A contractor's undertaking to pay all the owner's costs of construction would include his own contract price, *i.e.*, would amount to an undertaking to do the work for nothing—or less than nothing.

Plaintiff construes a $325,882 contract as a "$325,882-plus" contract; defendant construes it as a "$325,882-minus" contract. Both are wrong.

*Decree affirmed on both appeals, costs in this court to be paid one-half by each party, costs in the lower court to await disposition in that court.*